OPINION OF THE COURT
Frederic E. Hammer, J.
Defendant doctor moves to dismiss the complaint and compel arbitration. Plaintiff patient and defendant doctor had entered into arbitration agreements at preoperative conferences. This action is brought by Linda Miner, a patient, against her doctor, Richard Walden, for medical malpractice.
This court, by decision dated October 4, 1979 (NYLJ, Oct. 10, 1979, p 12, col 1) directed a hearing be conducted to determine: "(1) whether this contract was one of adhesion, and (2) whether plaintiff was fully aware of the nature and purpose of the arbitration agreement which she had signed.”
The hearing was conducted. Testimony was received from *815 plaintiff patient, defendant doctor, and the nurses employed at the doctor’s office.
Plaintiff testified that she does not recall having signed the two arbitration agreements, but that the signatures thereon are hers; that she was not aware of what she was signing, and that no explanation was made to her by either the doctor or the nurses as to the consequences, purposes or reasons for their execution. The doctor and three nurses testified that plaintiff did receive an explanation to some degree as to the purposes of the arbitration agreements. Plaintiff patient has had two operations performed: a rhinoplasty (reconstruction of nose) and a mastopexy (correction of sagging breasts). The rhinoplasty took place on the 10th of June, 1977, and the mastopexy on the 12th of November, 1978. The credible testimony is that prior to each of the operations, the patient was called into the doctor’s office. There were present the defendant doctor, a nurse, and the plaintiff. An explanation was made to her by the attending nurse and the doctor as to the meaning and purpose of the arbitration form, an authorization for surgery, and other papers. These forms, together with the preoperative appointments and surgical appointment were all enclosed in an envelope and mailed to plaintiff with a covering letter. The letter enclosing these items was a mimeographed form which contained, inter alia, the following language: "Included in the papers that require your signature is a form consenting to the placement of any future difficulty arising between yourself, your surgeon and/or Long Island Plastic Surgical Group, P.C., into arbitration. We require your signature on this form as well as our signature for reasons that we feel benefit both parties.” (Emphasis added.)
A California court (Madden v Kaiser Foundation Hosps., 17 Cal 3d 699, 706-707) suggested that such a policy favoring arbitration extends to its use in the disposition of medical malpractice claims. Notwithstanding the cogency of such policy favoring arbitration, and despite frequent judicial utterances that because of that policy every intendment must be indulged in favor of finding an agreement to arbitrate, the policy favoring arbitration cannot displace the necessity for proof of a voluntary agreement to arbitrate. (See Player v Brewster & Son, 18 Cal App 3d 526; Matter of Macy & Co. [National Sleep Prods.], 39 NY2d 268, 270; O’Keefe v South Shore Internal Medicine Assoc., NYLJ, Nov. 26, 1979, p 12, col 6.)
*816 In resolving this question, we commence with a basic premise that arbitration is consensual in nature. The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes through the judicial process "solely by reason of an exercise of choice by [all] parties” (Henderson, Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, 58 Va L Rev 947, 985).
Such agreement to arbitrate has been held to be enforceable if it had been openly and fairly entered into. In determining whether plaintiff in this case entered into such agreement, the principles governing enforcement of contracts of adhesion must be considered. Adhesion contracts refer to a standardized contract form offered to consumers of goods and services essentially on a "take it or leave it” basis, without affording the consumer a realistic opportunity to bargain, and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing to the form of the contract (Smith v Westland Life Ins. Co., 15 Cal 3d 111, 122, n 12; Blake v Biscardi, 62 AD2d 975, 977).
Thus, we see the word "require” appearing twice in the first paragraph of the covering form letter. The patient reading same but seeking the operation, albeit one for elective surgery, is placed in an inferior bargaining position.
"Under the doctrine of 'adhesion’, contracts may be invalidated if one party, who is in an inferior bargaining position, is required to sign a contract to waive his legal rights in order to obtain [a] needed service from the party in [a] superior bargaining position.” (Holder, Medical Malpractice Law [2d ed], p 416.)
"The application of adhesion contract principles to an arbitration clause in a contract for medical services presents distinct problems concerning the patient’s awareness of the contractual provision and his understanding assent thereto.” (Wheeler v St. Joseph Hosp., 63 Cal App 3d 345, 357.)
The issue is therefore refined. Is the patient who signs such an arbitration agreement fully aware of the consequences thereof?
"The CPLR arbitration provisions (CPLR 7501 et seq.) evidence a legislative intent to encourage arbitration. Certainly the avoidance of court litigation to save time and resources of both the courts and the parties involved make this a worth *817 while goal. One way to encourage the use of the arbitration forum would be to prevent parties to such agreements from using the courts as a vehicle to protract litigation. This conduct has the effect of frustrating both the initial intent of the parties as well as legislative policy.” (Matter of Weinrott [Carp], 32 NY2d 190, 199.)
Arbitration cannot be judicially mandated unless by clear and unequivocal language the parties involved have agreed thereto. (Matter of Lehman v Ostrovsky, 264 NY 130, 132.)
"An enforceable contract to arbitrate a dispute which may arise in the future between two equal parties is one thing, a requirement by a physician that a patient agree to arbitrate future professional negligence is quite another.” (Holder, Medical Malpractice Law [2d ed], p 416.)
The word "require” is defined in the dictionary as follows: "To demand; to order; to insist on having; to have need or necessity for; as to require a blood transfusion; to need or want. — v.i. To demand or force; compel.” (The Living Webster Encyclopedic Dictionary of the English Language [rev ed], p 815.)
"Require” is defined in Black’s Law Dictionary: "To direct, order, demand, instruct, command, claim, compel, request, need, exact. Beakey v. Knutson, 90 Or. 574, 174 P. 1149, 1150. * * * State ex rel. Frohmiller v. Hendrix, 59 Ariz. 184, 124 P. 2d 768, 773.” (Black’s Law Dictionary [4th ed], p 1468.)
"We have frequently said that, in construing statutes, words used therein are to be given their common meaning, unless it clearly appears that some special or technical meaning is intended by the legislature. Webster’s New International Dictionary, 2d Ed., is accepted by this court as giving the commonly understood definitions of all words in the English language.” (State ex rel. Frohmiller v Hendrix, 59 Ariz 184, 189, supra; Clark v New York Life Ins. & Trust Co., 64 NY 33.)
The defendant doctor is a college, medical and dental school graduate. The nurses employed by him are graduates of nursing schools. Counterposed to these educated people is the plaintiff who attended school but completed an eleventh grade education. To contrast this limited educational background against that of a professional doctor and his nursing staff could be unreasonable and unconscionable.
The doctrine of unconscionability is not new to American *818 jurisprudence. (See, e.g., Scott v United States, 79 US 443; Hume v United States, 132 US 406.)
In incorporating the doctrine of unconscionability, drafters of the Uniform Commercial Code merely codified the doctrine used by common-law courts to invalidate contracts under certain circumstances.
"Where the disparity in the consideration exchanged by the parties is overwhelming, that factor alone 'may be sufficient to sustain [a finding that the contract is unconscionable]’ since such disparity 'itself leads inevitably to the felt conclusion that knowing advantage was taken of [one party]’ (Jones v Star Credit Corp., 59 Misc 2d 189, 192 [Wachtler, J.]).” (Matter of Friedman, 64 AD2d 70, 85.)
"Whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract’s commercial setting, purpose, and effect”. (Wilson Trading Corp. v David Ferguson Ltd., 23 NY2d 398, 403.)
Doctors are held in high esteem and admiration by the public. The average person is not disposed to question or doubt a doctor’s treatment. Nor does the average person leave a doctor they rely upon and shop for another who does not require an arbitration agreement to be signed.
The classic elements of unconscionability are present in this case: unequal bargaining power, resulting in a contract more favorable to the defendant and for the sole benefit of the defendant.
Under the circumstances and conditions of this case, it cannot be said that the doctor and the patient bargained equally. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases meaningfulness of the choice is negated by a gross inequality of bargaining power * * * Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? * * * But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable *819 contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms.” (Williams v Walker-Thomas Furniture Co., 350 F2d 445, 449; Blake v Biscardi, 62 AD2d 975, supra.)
Subdivision (1) of section 2-302 of the Uniform Commercial Code reads: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.”
An agreement to arbitrate has been held to be enforceable if it had been openly and fairly entered into. It has long been public policy in New York State to favor arbitration over litigation as a means of settling disputes because (1) it is expeditious, (2) it avoids the delays of litigation, and (3) it relieves court congestion. (Mobil Oil Indonesia v Asamera Oil [Indonesia], 43 NY2d 276, 281-282.) "The language whereby a party agrees to or is under a duty to arbitrate should be clear and unequivocal and 'the burden lies on the party seeking arbitration’ (Matter of Allied Van Lines [Hollander Express], 35 AD2d 191, 193).” (Matter of Siegel v 141 Bowery Corp., 51 AD2d 209, 212.)
No mention of medical malpractice is contained in the instant arbitration agreement. It refers simply to a procedure to resolve all claims and disputes that may arise in the future "out of our medical relationship except for claims for money due for services rendered”.
An arbitration agreement will not be enforced unless it is "mutually binding”. Where an arbitration clause is not mutually binding, but rather grants one party a unilateral right to arbitrate, the court will not enforce such agreement. (Matter of Regeant of Shelby [Leumas Knitting Mills], 54 AD2d 667; Hull Dye & Print Works v Riegel Textile Corp., 37 AD2d 946.) The agreement to arbitrate in this matter purports to be an exchange of promises to arbitrate with each promise serving as consideration for the other. In return for the patient’s consent to arbitrate all claims arising out of the medical relationship, the doctor agreed to arbitrate all claims except claims of money due for services rendered. In a doctor-patient relationship, the only possible claim the doctor would have is *820 a claim of money for services rendered. This claim is specifically reserved by the doctor and excluded from the agreement.
In Dwyer v Biddle (274 App Div 903), the defendant doctor required the patient to sign a contract containing an arbitration clause. Despite the agreement to arbitrate, plaintiff instituted a malpractice suit and defendant moved to stay the action on the grounds that the agreement to arbitrate precluded the patient’s malpractice action. The court denied the motion for a stay and held (p 904): "There is no satisfactory showing of the existence of a reciprocally enforcible written contract of the parties containing the claimed arbitration clause.”
Assuming that there is a presumption that one who signs a contract has read it, there still appears to be a question as to whether plaintiff did in fact read the agreement, and if so, did she understand it. Was she obliged to sign the agreement due to the word "require” appearing in the covering letter?
The court finds the contract was unconscionable and unilateral. The motion to compel arbitration and dismiss the complaint is denied.