MOORE v FRAGATOS

Docket No. 55332. Submitted November 9, 1981, at Detroit.—Decided
April 30, 1982. Leave to appeal applied for.

DeWitt T. and Marie Moore brought an action against Dr. Peter
Fragatos, Detroit-Macomb Hospitals Association and others in
the Wayne Circuit Court, alleging medical malpractice. Defen-
dant Hospital Association filed a motion to compel arbitration
or for accelerated judgment, alleging that DeWitt Moore had
executed an arbitration agreement and had not revoked it
within the statutorily prescribed time period and that, there-
fore, the trial court lacked subject-matter jurisdiction. Moore
testified that when he was admitted he was handed some
papers by the receptionist. The receptionist told him that the
documents were his admittance papers and needed to be signed.
After signing the papers, he was taken upstairs. According to
him, he did not read the documents he signed, was unaware of
their nature, and received no explanation of the documents
from the receptionist. He identified the signature on the agree-
ment as his own but contended that he would not have signed
the document if it had been explained to him. He testified he
had been under the impression that he had to sign the docu-
ments in order to be admitted, and he did not learn that he had
executed the agreement until almost a year later. He did,
however, admit that it was possible that the admitting clerk
had, in fact, explained the agreement to him. Nevertheless, he
insisted that he would not remember anything about any such
explanation inasmuch as he was in pain at the time. Linda
Huckaby, admitting clerk at Detroit Memorial Hospital on the
date of Moore's admission, did not specifically remember
Moore's admission to the hospital and could only testify about
the so-called "standard procedure". She testified that she was
instructed to offer the arbitration agreement along with a
patient information booklet and that she would explain to
patients that the agreement "means that they [the patients]

REFERENCES FOR POINTS IN HEADNOTE
5 Am Jur 2d, Arbitration and Award § 11 et seq.
61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 376.
Arbitration of medical malpractice claims. 84 ALR3d 375.

are agreeing to settle all grievances that they have against the hospital outside of court before an arbitration panel". According to Huckaby, she was required to explain the arbitration agreement to each patient and would even read the agreement to a patient who was unable to read. She testified that she would also inform patients that signing the form was "optional" and could be revoked within 60 days. The trial court, Maureen P. Reilly, J., ruled that Moore knowingly and voluntarily signed the arbitration agreement and dismissed all the defendants. Plaintiffs appealed. *Held:*

1. A party in a civil proceeding seeking to assert a waiver of the constitutional right to access to the courts must establish that the waiver was made knowingly, voluntarily and intelligently. The only evidence of a knowing waiver was testimony bearing on the hospital's "usual procedure". It was insufficient to conclude that Moore knowingly waived his right to access to the courts. Nor was there evidence to show that Moore's waiver was made intelligently, with knowledge of all relevant information, or voluntarily.

2. When a defendant in a malpractice action moves for accelerated judgment on the ground that the plaintiff has executed an arbitration agreement, the trial court shall conduct a hearing. At the hearing, the defendant must affirmatively show that before signing the agreement, the plaintiff was specifically informed: (1) that the form he was being asked to sign was an arbitration agreement, (2) that by signing the form, he would be giving up his right to trial by jury or a judge, (3) that the arbitration panel that would decide his case would include an attorney, a layman, and a doctor or a hospital administrator, (4) that physicians and hospital administrators on arbitration panels may have an incentive to minimize the number and size of malpractice awards because their malpractice insurance rates are directly affected by those awards, (5) that he did not have to sign the arbitration agreement, (6) that the patient would receive the same quality of medical treatment and would be attended to just as quickly, whether or not he chose to sign the agreement, (7) that doctors and hospitals are not permitted to refuse treatment to patients who do not sign the agreement, and (8) that signing the agreement is entirely up to the patient. The defendant must then show by a preponderance of the evidence that the plaintiff voluntarily executed the agreement.

Reversed and remanded.

PHYSICIANS AND SURGEONS — MEDICAL MALPRACTICE — ARBITRATION.
When a defendant in a malpractice action moves for accelerated

judgment on the ground that the plaintiff has executed an arbitration agreement, the trial court shall conduct a hearing; at the hearing, the defendant must affirmatively show that before signing the agreement, the plaintiff was specifically informed: (1) that the form he was being asked to sign was an arbitration agreement, (2) that by signing the form, he would be giving up his right to trial by jury or a judge, (3) that the arbitration panel that would decide his case would include an attorney, a layman, and a doctor or hospital administrator, (4) that physicians and hospital administrators on arbitration panels may have an incentive to minimize the number and size of malpractice awards because their malpractice insurance rates are directly affected by those awards, (5) that he did not have to sign the arbitration agreement, (6) that the patient would receive the same quality of medical treatment and would be attended to just as quickly, whether or not he chose to sign the agreement, (7) that doctors and hospitals are not permitted to refuse treatment to patients who do not sign the agreement, and (8) that signing the agreement is entirely up to the patient; the defendant must then show by a preponderance of the evidence that the plaintiff voluntarily executed the agreement.

*Roth & Dean, P.C.,* for plaintiffs.

*Moll, Desenberg, Bayer & Behrendt* (by *Stephen D. McGraw),* for defendants David W. Linder, M.D., and David W. Linder, M.D., and Associates, P.C.

*Dice, Sweeney, Sullivan & Feikens, P.C.* (by *David R. Getto),* for defendants Levi L. Guerrero and Detroit-Macomb Hospitals Association.

Before: R. M. MAHER, P.J., and D. F. WALSH and D. C. RILEY, JJ.

R. M. MAHER, P.J. Plaintiffs appeal by right from an order of the circuit court granting defendants' motion for accelerated judgment.

On April 20, 1976, plaintiff DeWitt T. Moore (plaintiff) was admitted to Detroit Memorial Hospi-

tal. During his hospitalization, plaintiff underwent myelography and cervical disc surgery performed by defendant Dr. Peter Fragatos. These procedures formed the basis of a malpractice complaint filed against the defendants on April 19, 1978.

On April 11, 1980, defendant Detroit-Macomb Hospitals Association (the hospital) filed a motion to compel arbitration and/or for accelerated judgment, alleging that plaintiff had executed an arbitration agreement and had not revoked it within the statutorily prescribed time period and that, therefore, the trial court lacked subject-matter jurisdiction.

An evidentiary hearing was conducted on September 15, 1980. Both plaintiff and the admitting clerk of the hospital offered testimony bearing on the circumstances surrounding plaintiff's execution of the arbitration agreement. Plaintiff testified that when he was admitted he was handed some papers by the receptionist. The receptionist told him that the documents were his admittance papers and needed to be signed. After signing the papers, he was taken upstairs. According to plaintiff, he did not read the documents he signed, was unaware of their nature, and received no explanation of the documents from the receptionist.

Plaintiff was then shown a copy of the arbitration agreement. He identified the signature on the agreement as his own but contended that he would not have signed the document if it had been explained to him. According to plaintiff, he had been under the impression that he had to sign the documents in order to be admitted, and he did not learn that he had executed the agreement until almost a year later. Plaintiff did, however, admit that it was possible that the admitting clerk had,

in fact, explained the agreement to him; nevertheless, he insisted that he would not remember anything about any such explanation inasmuch as he was in pain at the time.

Linda Huckaby was the admitting clerk at Detroit Memorial Hospital on April 20, 1976. She did not specifically remember plaintiff's admission to the hospital on that date and could only testify about the so-called "standard procedure".

According to Huckaby, the arbitration agreements were first used in the spring of 1976. She testified that she was instructed to offer the arbitration agreement along with a patient information booklet and that she would explain to patients that the agreement "means that they [the patients] are agreeing to settle all grievances that they have against the hospital outside of court before an arbitration panel". According to Huckaby, she was required to explain the arbitration agreement to each patient and would even read the agreement to a patient who was unable to read. She testified that she would also inform patients that signing the form was "optional" and could be revoked within 60 days.

At the conclusion of the hearing, the trial court ruled from the bench that the medical malpractice arbitration act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* was constitutional and that plaintiff knowingly and voluntarily signed the arbitration agreement. On December 8, 1980, the court entered an order dismissing all defendants. Plaintiffs appeal as of right, contending, *inter alia,* that the trial court erred in finding that plaintiff knowingly and voluntarily signed the arbitration agreement.

I

Generally, panels of this Court which have dealt with the medical malpractice arbitration act, MCL

600.5040 *et seq.;* MSA 27A.5040 *et seq.,* have focused on its constitutionality.[1] Typically, plaintiffs have contended that the act violates their "due process right to a hearing before a fair and impartial tribunal by mandating that at least one member of the arbitration panel be a physician, preferably from the defendant's medical specialty, or, where a hospital is the sole defendant, a hospital administrator. US Const, Am XIV; Const 1963, art 1, § 17; MCL 600.5044(2); MSA 27A.5044(2)." *Jackson v Detroit Memorial Hospital,* 110 Mich App 202, 204; 312 NW2d 212 (1981). Although this argument would have considerable merit in the context of a statutory scheme providing for mandatory arbitration, it is less persuasive in the situation before us in view of the fact that an arbitration agreement is essentially a contract between two private parties.[2] Therefore, our inquiry must focus on the contractual aspects of the malpractice arbitration problem.

[1] See *e.g., Cushman v Frankel,* 111 Mich App 604; 314 NW2d 705 (1981); *Jackson v Detroit Memorial Hospital,* 110 Mich App 202; 312 NW2d 212 (1981); *Piskorski v Art Centre Hospital,* 110 Mich App 22; 312 NW2d 160 (1981); *Williams v O'Connor,* 108 Mich App 613; 310 NW2d 825 (1981); *Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981); *Brown v Siang,* 107 Mich App 91; 309 NW2d 575 (1981).

[2] The distinction is very significant. Since arbitration is essentially a contract between private parties, there is normally no need for judicial inquiry into the propriety of the choice of arbitrators. For example, if Mr. Smith and Mr. Jones decide that they will agree to have future disputes settled by a mutually agreeable third party or parties, the courts will generally uphold the validity of that agreement. This will be true even if the arbitrator is Mr. Smith's best friend, as long as Mr. Jones was aware that the arbitrator was Mr. Smith's best friend prior to signing the agreement. Absent other considerations, Mr. Jones cannot later petition for rescission on the ground that his decision to agree was unwise. Mr. Jones is not entitled to relief from his own stupidity.

The sole question for a court under such circumstances is whether "other considerations" that would justify rescission are present. Consequently, this Court need not address the wisdom of signing an arbitration agreement, in the abstract.

We begin with the proposition that access to the
court system is a fundamental constitutional right.
US Const, Am XIV.[3] The arbitration agreement
involved here is, therefore, a special kind of con-
tract, since it entails the waiver of a fundamental
constitutional right. It is well-settled that, in order
to establish the waiver of a fundamental constitu-
tional right in the context of a criminal proceed-
ing, the state must show that the waiver was made
knowingly, voluntarily, and intelligently. See, *e.g.*,
*Brady v United States,* 397 US 742, 748; 90 S Ct
1463; 25 L Ed 2d 747 (1970); *Miranda v Arizona,*
384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694
(1966). However, it is unclear whether a similar
standard applies to civil proceedings.

The United States Supreme Court has found it
unnecessary to address this issue in two recent
cases involving due process in civil proceedings.[4]
However, the Court has stated, with reference to
civil proceedings, that "[w]e do not presume acqui-
escence in the loss of fundamental rights". *Ohio
Bell Telephone Co v Public Utilities Comm,* 301
US 292, 307; 57 S Ct 724; 81 L Ed 1093 (1937).
Moreover, the Court has held that, in the civil
area, "courts indulge every reasonable presump-

[3] The United States Supreme Court has indicated that the right to
access to the courts is a fundamental right. *Bounds v Smith,* 430 US
817, 828; 97 S Ct 1491; 52 L Ed 2d 72 (1977). See, also, *Thayer v
Phillips Petroleum Co,* 613 P2d 1041, 1044-1045 (Okla, 1980). "Access
to the courts of the United States is a constitutional right guaranteed
by the due process clauses of the fifth and fourteenth amendments."
*Silver v Cormier,* 529 F2d 161, 163 (CA 10, 1976). According to
*California Motor Transport Co v Trucking Unlimited,* 404 US 508,
513; 92 S Ct 609; 30 L Ed 2d 642 (1972), and *Crews v Petrosky,* 509 F
Supp 1199, 1204, fn 10 (Pa, 1981), the First Amendment right "to
petition the Government for a redress of grievances" includes the
right to access to the courts.

[4] See *D H Overmyer Co, Inc, of Ohio v Frick Co,* 405 US 174, 185-
186; 92 S Ct 775; 31 L Ed 2d 124 (1972); *Fuentes v Shevin,* 407 US 67,
94-96; 92 S Ct 1983; 32 L Ed 2d 556 (1972).

tion against waiver". *Aetna Ins Co v Kennedy,* 301 US 389, 393; 57 S Ct 809; 81 L Ed 1177 (1937).

The United States Supreme Court has wisely interpreted the constitution to provide a broad range of procedural protections of the rights of criminal defendants. We perceive no good reason why honest law-abiding citizens should not be entitled to similar protections. Accordingly, we hold that a party in a civil proceeding seeking to assert a waiver of the constitutional right to access to the courts must establish that the waiver was made knowingly, voluntarily and intelligently.[5]

We turn now to the application of this principle to the case at bar.

## II

In order to assert a waiver of plaintiff's right to court access, defendants must show that the waiver was knowing, intelligent, and voluntary.

## A

We begin with an analysis of the requirement that the waiver be made knowingly.

---

[5] This is not a novel concept of Michigan jurisprudence. See *Morris v Metriyakool, supra* (BRONSON, J., *concurring):*

"Defendants' most persuasive argument for upholding Michigan's arbitration system is that the parties voluntarily entered into the agreement to arbitrate. I start from the premise that for the waiver of a constitutional right to be effective, there must be an intentional relinquishment or abandonment of a known right, *Johnson v Zerbst,* 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938); *People v Jaworski,* 387 Mich 21, 30; 194 NW2d 868 (1972); *People v Grimmett,* 388 Mich 590, 598; 202 NW2d 278 (1972); *People v Lucas,* 47 Mich App 385, 388-389; 209 NW2d 436 (1973); *People v Kitley,* 59 Mich App 71, 75; 228 NW2d 834 (1975); *People v Brewer,* 88 Mich App 756, 760; 279 NW2d 307 (1979), *lv den* 407 Mich 856 (1979). Although I fail to find any Michigan civil cases involving effective waiver of a constitutional right, there is no reason to treat fundamental constitutional rights differently solely because they arise in the civil context." *Id.,* 130-131.

Assuming *arguendo* that if plaintiff had read the agreement (or if it had been explained to him) his waiver could be properly characterized as "knowing", was there sufficient evidence that plaintiff read or was informed of the nature of the agreement?

There was very little evidence that plaintiff was aware that he was signing an arbitration agreement. Plaintiff testified that he never read the papers he signed and that he did not remember being informed of their nature (other than that they were admittance papers and needed to be signed). Witness Huckaby, on the other hand, could only testify about the hospital's "usual procedure" and provided no direct evidence that plaintiff was aware of the nature of the agreement. One additional factor provides support for a finding that the waiver was "knowing": the presumption that a person has read what he has signed. See *Cleaver v̇ Traders' Ins Co,* 65 Mich 527; 32 NW 660 (1887).[6] This presumption, in our view, rests not upon reality, but upon procedural convenience. As such, it cannot stand against the presumption against waiver of a constitutional right, which is based upon a rational inference from the facts.[7] We find the latter presumption the weight-

----

[6] This presumption, however, is not conclusive, as it may be rebutted by evidence that the party signing the contract was misled as to its contents by another party. See *Van Houten v Metropolitan Life Ins Co,* 110 Mich 682; 68 NW 982 (1896).

[7] See George, *A Practical Analysis of Michigan Evidence Law,* § 15.60(d), p 15.60-11:

"In resolving matters like these, one must consider on whom the burden of persuasion lies as far as a given ultimate fact is concerned, the degree to which each of the several possible operative presumptions rest on rational inference or procedural convenience, and the extent to which if at all, there are rebuttal proofs. A step-by-step

ier of the two; therefore, it must prevail.[8]

The only evidence of a knowing waiver in the instant case was testimony bearing on the hospital's "usual procedure". In order to establish such a waiver, the record must affirmatively show that the plaintiff was aware that he was signing an arbitration agreement. Surely, in a criminal proceeding, the prosecution could not withstand a *Miranda* challenge merely by presenting a police officer's testimony that it was his "usual practice" to inform suspects of their rights before attempting to obtain confessions. Nor could the prosecution meet its burden by producing a waiver form signed by the defendant, absent affirmative proof that he had read the form, or that it had been read to him.[9]

We conclude that defendants failed to present sufficient evidence of a knowing waiver of plaintiff's right to access to the courts. Accordingly, we hold that the trial court erred in granting defendants' motion for accelerated judgment. Plaintiff is entitled to present his case to a jury.

## B

We now address the requirement that the waiver must be "intelligent".

analysis of each presumption should enable a court to reach a satisfactory dispute resolution."

[8] See McCormick, Evidence, 2d ed, § 345, pp 819, 824 ("the weightier presumption" should prevail—particularly "where one of the presumptions is grounded in a predominant social policy").

[9] The arbitration agreement also contains the following clause:

"I certify that I have read this agreement or have had it read to me and that I fully understand its content and execute this agreement of my own free will."

Of course, such a recitation would be essentially meaningless in determining compliance with *Miranda,* and we accord it similar weight in the present context.

In order to assert a waiver of the right to access to the courts, a party must show more than the plaintiff's awareness that he was signing an "arbitration agreement". In other words, such a waiver must be intelligent as well as knowing. In order to make an intelligent choice, a person must be informed of the consequences of his decision: *i.e.,* the *material* differences between malpractice arbitration and trial in a civil court.

A party seeking to enforce a waiver of a plaintiff's right to access to the court system must show that the plaintiff was aware of all material information about the arbitration procedure. "Material" information, in our view, is information that a reasonable person would consider important in deciding whether or not to sign an arbitration agreement.[10]

Assuming *arguendo* that plaintiff had read the agreement (or that it had been explained to him), would this be sufficient evidence that he made an intelligent waiver of his right to access to the courts? In other words, does the agreement disclose all material information about the malpractice arbitration procedure?

The arbitration agreement executed by plaintiff provides, in pertinent part:

---

[10] " 'Material' information is anything of which an average prudent investor ought reasonably to be informed before deciding whether to buy, sell or hold an affected security. 17 CFR 230, 204(1) (1971), applied in *Gilbert v Nixon,* 429 F2d 348, 356 (CA 10, 1970), and *Johns Hopkins University v Hutton,* 422 F2d 1124, 1128-1129 (CA 4, 1970). If a reasonable investor would consider a particular item of information important in making such a decision, that fact is 'material' per se. *Affiliated Ute Citizens of Utah v United States,* 406 US 128, 153-154; 92 S Ct 1456; 31 L Ed 2d 741 (1972)." *Gerber Products Co v Anderson, Clayton & Co,* 76 Mich App 410, 415; 256 NW2d 754 (1977).

"I understand that Michigan Law gives me the choice
of trial by judge or jury or of arbitration. I understand
that arbitration is a procedure by which a panel that is
either mutually agreed upon or appointed decides the
dispute rather than a judge or jury."

The agreement does not disclose the composition of
a malpractice arbitration panel. There is no expla-
nation of the manner in which a panel is "mutu-
ally agreed upon". Moreover, there is no explana-
tion of the circumstances under which panel mem-
bers must be appointed or who is responsible for
such appointments.[11] However, we still must deter-
mine whether a reasonable person would consider
this nondisclosed information important in decid-
ing whether or not to sign an arbitration agree-
ment.

Once again, we emphasize that we need not
decide whether or not the inclusion of a physician
or hospital administrator on each arbitration
panel violates the due process requirement of a
fair and impartial tribunal, as many other panels
of this Court have done.[12] Rather, we must decide
whether the composition of the panel is "material"
information.

[11] We acknowledge that the composition of the panel is set forth in
the "Patient Information Booklet". However, the critical question is
whether the language of the *agreement itself* adequately discloses the
mechanics of the arbitration agreement. After all, even assuming that
the patient actually receives the booklet (as mandated by the statute),
the patient is required to make a decision about signing the agree-
ment *prior* to any opportunity to read the booklet. We observe that to
expect a patient, on his own initiative and for no apparent reason, to
read the Patient Information Booklet defies reality. Consequently,
defects in the language of the agreement cannot be cured through
disclosures made in the booklet.

[12] Compare *Cushman v Frankel,* 111 Mich App 604; 314 NW2d 705
(1981); *Williams v O'Connor,* 108 Mich App 613; 310 NW2d 825 (1981);
*Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981);
*Brown v Siang,* 107 Mich App 91; 309 NW2d 575 (1981), with *Jackson
v Detroit Memorial Hospital,* 110 Mich App 202; 312 NW2d 212
(1981), and *Piskorski v Art Centre Hospital,* 110 Mich App 22; 312
NW2d 160 (1981).

Each arbitration panel is composed of a physician or hospital administrator, an attorney, and a lay person. MCL 600.5044(2); MSA 27A.5044(2). See *Brown v Siang,* 107 Mich App 91, 99; 309 NW2d 575 (1981). In *Brown,* a panel of this Court concluded that "[t]he safeguards within the statute to insure impartiality cure any possibility that an *irate* health care provider will serve on the panel". (Emphasis added.) *Id.,* 104.[13]

This argument, however, misses the point. The paramount difficulty engendered by the presence of a physician or hospital administrator on the arbitration panel is not the possibility of an *irate* health care provider serving on the panel, since such an obvious bias would result in disqualification. Rather, the danger lies in the substantial likelihood that a health care provider's decisions will be swayed by *unconscious subliminal* bias, impossible to detect. We find the possibility of such subconscious bias sufficiently strong to compel the conclusion that a reasonable man would consider the presence of a health care provider on the panel important in deciding whether or not to sign an arbitration agreement.

In *Morris v Metriyakool, supra,* 125-126, fn 5, and supporting text, Judge BRONSON's partially concurring opinion cites the conclusion of two experienced medical malpractice insurance underwriters that

"* * * any hospital administrator or physician would have a direct and substantial interest in the outcome of arbitrated cases insofar as any award rendered in plaintiff's favor would affect both the availability and cost of medical malpractice insurance." 107 Mich App 110, 125.

---

[13] Other panels have employed a similar rationale. See *Morris v Metriyakool, supra,* 119-120, and *Cushman v Frankel, supra,* 610.

Indeed, the Legislature has recognized the validity of this conclusion by enacting MCL 500.3062; MSA 24.13062, which provides in part:

"(1) Within 3 years after the approval of policy forms under this chapter, the commissioner shall require a complete review of experience under the forms approved including experience of every malpractice insurer participating in arbitration. *If appropriate and warranted by experience, the commissioner shall order a refund of premiums paid by participating insureds or a prospective reduction of rates.*" (Emphasis supplied.)

Apparently, a pattern of lower malpractice awards is one type of experience that would justify a refund of premiums or reduction of rates. If so, physician-arbitrators would seem to have a direct interest in reducing the number and size of malpractice awards.[14]

This significant potential for bias is amplified by the composition of the advisory committee that selects the pool of candidates from which the medical, legal, and lay members of arbitration panels are chosen—the equivalent of the jury venire.[15] MCL 500.3054; MSA 24.13054 states in pertinent part:

---

[14] Such a bias is not necessarily manifested in an award in favor of a defendant physician or hospital; it may also result in awards in favor of plaintiff patients in an amount less than a jury would award, or less than a panel composed entirely of nonmedical persons would award.

[15] Our analysis of the arbitrator selection system is borrowed from cases involving challenges to jury venires. Those cases never suggested that it was the challenging party's duty to show that every member of the jury venire was biased against the challenging party. Rather, courts have focused on the need to select jury venires from a cross-section of the population, to eliminate the possibility of bias shared by a particular group of people. See, *e.g., Robson v Grand Trunk W R Co,* 5 Mich App 90; 145 NW2d 846 (1966). Similarly, in the present context, plaintiffs who challenge the entire health care provider "venire" should not have to prove "that all physicians disfavor equitable results in malpractice cases". *Brown v Siang, supra,* 104.

"(1) An arbitration advisory committee is created within the bureau of insurance and shall be appointed by the commission and shall consist of 18 members. One-half of the advisory committee shall be broadly composed of licensed physicians and other health care providers, licensed hospital or institutional health care providers, malpractice insurance carriers and licensed legal practitioners. One-half shall be broadly composed of nongovernmental, nonlawyer, nonhealth care provider and noninsurance carrier persons."

Since the "medical half"[16] of the advisory committee is undoubtedly more familiar with the qualifications of potential medical members of arbitration panels than the "nonmedical half", we feel that the "medical half" will be largely responsible for the selection of the "medical pool".[17] The medical half of the committee is partially composed of malpractice insurance carriers and health care providers. Clearly, these entities have a direct interest in minimizing the number and size of malpractice awards. Thus, there is a substantial possibility that they will choose candidates who are similarly inclined.

Almost a hundred years ago, the Michigan Supreme Court held that "[w]hen there is serious doubt of an officer's fairness, he should not be employed to choose jurors". *People v Felker*, 61

---

[16] Although we employ the term "medical half", we wish to point out that this group includes malpractice insurance carriers and attorneys as well as health care providers.

[17] The duties of the advisory committee are set forth in MCL 500.3055; MSA 24.13055, in pertinent part:

"(c) Suggest criteria for the arbitrator candidates.

"(d) *Generate a pool of candidates* and provide initial screening in cooperation with the arbitration association develop uniform model arbitration consent forms, informational brochures and letters for office and hospital use which shall be subject to approval by the commissioner."

Mich 114, 116; 28 NW 83 (1886).[18] We entertain serious doubts in the advisory committee's impartiality. The substantial possibility of biased physician-arbitrators, compounded by the manner in which they are selected, leads us to conclude that the presence of a physician or hospital administrator on malpractice arbitration panels is "material" information. Since the presence of a health care provider on an arbitration panel is "material", a patient's waiver of the right to court access cannot be deemed "intelligent" unless he is aware of this information.

Accordingly, we held that a party seeking to assert the waiver of a patient's right to access to the courts must affirmatively show that the patient was informed: (1) that by signing the form, he would be giving up his right to trial by jury or a judge, (2) that the arbitration panel that would decide his case would include an attorney, a layman, and a doctor or hospital administrator, and (3) that doctors and hospital administrators on arbitration panels may have an incentive to minimize the number and size of malpractice awards, because their malpractice insurance rates are directly affected by those awards.[19]

The record does not affirmatively show that plaintiff received this information. Evidence of the hospital's "usual procedure" is insufficient. Plaintiff is entitled to reversal on this ground alone.

---

[18] We note that this case has not been cited in the 96 years since its release. On the other hand, it has never been overruled.

[19] Since we have determined that the party seeking to assert the waiver must show that the patient was specifically given this information, we need not decide whether failure to emphasize (by the use of, e.g., bolder or darker type, italics, highlighting by indentation, underscoring, or boxing off) the critical portions of the agreement is also objectionable.

## C

We now turn our attention to the requirement that the waiver be made voluntarily.

We find instructive in this regard the United States Supreme Court's approach to ensuring the voluntariness of waivers of Fifth Amendment rights, as exemplified by *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In *Miranda,* the Court set forth a prophylactic rule intended to counter the coerciveness inherent in custodial police interrogation. Accordingly, we must examine the circumstances surrounding the execution of each arbitration agreement in order to gauge the coercive potential of the setting.

Glass, *Restructuring Informed Consent: Legal Therapy for the Doctor-Patient Relationship,* 79 Yale LJ 1533, 1537 (1970), offers useful insights into the phychological set of medical patients:

"The patient is expected to assume a child's role. He suffers from pain which he does not understand, and his anxieties are aroused. He is 'incapacitated,' excused from his normal functioning and, like a child, becomes dependent on others to take care of him. In this state, the patient is particularly vulnerable to many forms of exploitation.[11] For help he turns to the physician. The physician's specificity of function and altruistic motivation legitimate his assumption of power over the patient's treatment because the doctor is expected to resolve the patient's problems in the best interest of the patient. This is the prevailing standard of professional responsibility.

"[11] By exploitation is meant psychological manipulation of the patient to serve the financial, emotional, or negarious ends of the exploiter * * *." (Further footnotes omitted.)[20]

[20] These views were quoted with approval in Stone, *Informed Consent: Special Problems for Psychiatry* in 30 *Hospital & Community Psychiatry* 321 (1979).

Similar sentiments are expressed in Rubin, *Medical Malpractice Suits Can Be Avoided,* 52 Hospitals, Jaha 86, 87 (1978):

"The hospital often seems to be a threatening, hostile environment to many patients who may be frightened and bewildered by their illnesses."

With regard to the difficulty encountered in allaying those fears, the author notes:

"A hospitalized patient is in a completely dependent, childlike position. His clothes have been removed, his privacy and sense of dignity are constantly intruded upon, and he is removed from the familiar surroundings of his home to a sometimes frightening, frantically busy atmosphere. His concern about his illness, his pain and suffering, and his helplessness are real problems. It is, of course, unrealistic to expect every staff member who interacts with a patient to identify personally with the patient's problems." *Id.*

The impact of those factors on the decision-making process is discussed in Bille, *The Nurse's Role in Informed Consent,* Quality Review Bulletin, February, 1980, pp 25, 26:

"An important element in the consent procedure is the voluntary decision made by the patient. Some patients may need assistance from someone, such as a patient advocate, to ensure that they comprehend all relevant medical information before making their decision. Besch [27 Nurs Outlook 34-35 (1979), "Informed consent: A patient's right"] reported research which found that 'the doctor-patient relationship appeared to interfere with patient autonomy. Patients tended to trust their physicians' recommendations completely. Many did not understand that a decision was being asked of them— that consent, rather than compliance, was desired. By virtue of the physician's authoritative role, an element of coercion may be introduced into the consent procedure, thus preventing the patient from making a voluntary decision. Coercion nullifies consent'." (References omitted.)

This general pattern of complete trust in physicians by their patients is corroborated by another study, Bergler, et al, *Informed consent: How much does the patient understand?,* 27 Clinical Pharmacology and Therapeutics 435, 488 (1980), which found "[a] high level of personal trust and dependency * * * in the individual profiles of 75% of the patient[s]". Noting that "the dependency pattern was not related to the level of education attained", the study concluded:

"Thus, although informed consent is desired by the patients, the most important factor motivating most of them to give their consent appears to be their confidence and trust in the physician and nurse rather than in their understanding of the information provided in the consent procedure." *Id.,* 439.

See generally Haug, *Doctor Patient Relationships and the Older Patient,* 34 Journal of Gerontology 852 (1979).

At least one reported case has relied upon such medical findings. See *Miner v Walden,* 101 Misc 2d 814; 422 NYS2d 335, 338 (1978), in which the court noted:

"Doctors are held in high esteem and admiration by the public. The average person is not disposed to question or doubt a doctor's treatment."

We find the coerciveness inherent in the physician-patient relationship sufficiently compelling to justify the imposition of a prophylactic rule to ensure the voluntariness of waivers of the right to court access, in the context of medical malpractice arbitration agreements. Accordingly, we hold that a party seeking to assert the waiver of a patient's right to access to the courts must affirmatively show that the patient was informed: (1) that he did not have to sign the arbitration agreement, (2) that the patient would receive the same quality of medical treatment and would be attended to just as quickly whether or not he chose to sign the agreement, (3) that doctors and hospitals are not permitted to refuse treatment to patients who do not sign the agreement, and (4) that signing the agreement is entirely up to the patient.

Since the record does not affirmatively show that plaintiff was so informed, we are compelled to reverse on this ground alone.

We wish to emphasize, however, that even if plaintiff had been specifically apprised of the foregoing information, we would nevertheless find his waiver involuntary as a matter of law, for the following reasons:

(1) plaintiff was asked to sign the agreement at the time of his admission to the hospital;[21]

(2) the uncontroverted evidence shows that plaintiff was in considerable pain when he signed the agreement; and

---

[21] Although we find the period of time immediately preceding admission to a hospital particularly conducive to coercion, we do not wish to suggest that handing a patient the form at another time necessarily means that the agreement was executed voluntarily. In our view, coercive potential commences at a high level when a patient learns that he or she will require hospitalization and then builds to a crescendo which does not begin to taper off until some time after release from the hospital.

Nothing in the statute requires health care providers to hand patients arbitration agreements at the time of their admission to the hospital.

(3) the defendants have made no effort to preserve an accurate record of the circumstances surrounding the execution of the agreement.[22]

We expressly decline to decide whether the presence of any of the above factors compels a finding that a particular waiver was involuntary as a matter of law. Such a determination should be based upon an examination of the totality of the circumstances surrounding the execution of the arbitration agreement.

## III

Our holding in the instant case finds considerable support in the United States Supreme Court's pronouncements on the proper standards to be employed in determining the validity of waivers of due process rights in the context of civil proceedings. In *D H Overmyer Co, Inc, of Ohio v Frick Co,* 405 US 174; 92 S Ct 775; 31 L Ed 2d 124 (1972), the Court upheld the validity of a cognovit clause which was incorporated in an agreement between two private parties, against a contention that the

---

[22] Health care providers, much more than patients, are aware of the complications which may follow the execution of an arbitration agreement. Hence, they are in a better position to preserve evidence of the circumstances surrounding the execution of such an agreement by, for example, the use of a tape recorder. We can hardly expect patients to recognize the importance of taping this event.

"The rule is well established that where there is a deliberate destruction of or failure to produce evidence in one's control a presumption arises that if the evidence were produced it would operate against the party who deliberately destroyed or failed to produce it." *Johnson v Secretary of State,* 406 Mich 420, 440; 280 NW2d 9 (1979).

We believe that the failure of a health care provider to employ such a simple and inexpensive measure (which will considerably ease the task of a reviewing court in determining the voluntariness issue) supports a reasonable inference that if such an accurate record were produced it would "operate against" the health care provider—the party in the best position to produce it.

clause permitted a deprivation of property without notice or a hearing. The Court held that

"Overmyer, in its execution and delivery to Frick of the second installment note containing the cognovit provision, voluntarily, intelligently, and knowingly waived the rights it otherwise possessed to prejudgment notice and hearing, and that it did so with full awareness of the legal consequences." 405 US 174, 187.

The Court pointed out that the *Overmyer* case did not involve "unequal bargaining power or overreaching", and that the agreement was "not a contract of adhesion". The Court noted that Overmyer was not contending "that it or its counsel was not aware of the significance of the note and of the cognovit provision". *Id.*, 186. Finally, the Court indicated that their holding was not "controlling precedent for other facts of other cases". *Id.*, 188. "For example," the Court continued, "where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue." *Id.* We find considerable disparity in bargaining power between patients and health care providers.

We need only observe, as did the United States Supreme Court in *Fuentes v Shevin,* 407 US 67, 95; 92 S Ct 1983; 32 L Ed 2d 556 (1972),[23] that the *Overmyer* contract "was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations". In contrast to the case at bar, the situation addressed by the *Over-*

[23] Although the precedential value of *Fuentes* was thrown into doubt by the Supreme Court's holding in *Mitchell v W T Grant Co,* 416 US 600; 94 S Ct 1895; 40 L Ed 2d 406 (1974); *North Georgia Finishing, Inc v Di-Chem, Inc,* 419 US 601; 95 S Ct 719; 42 L Ed 2d 751 (1975), reaffirmed the vitality of the *Fuentes* rationale.

*myer* Court presented little danger that a waiver would not be made knowingly, intelligently, and voluntarily. In rejecting a purported waiver of due process rights—contained in a contract between two private parties—on the ground that it was insufficiently specific to constitute such a waiver, the *Fuentes* Court noted that the party seeking to assert the waiver had "made no showing whatever that the [other party was] actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights". *Fuentes, supra,* 95. We have adopted a similar rationale in the present case and have found, as did the Court in *Fuentes,* that the defendants have failed to show that plaintiff was actually aware or made aware of the significance of the arbitration agreement.

We also note that our disposition of this case is consistent with the policy expressed by another panel of this Court in *DiPonio v Henry Ford Hospital,* 109 Mich App 243, 250; 311 NW2d 754 (1981):

> "The enforcement of the arbitration agreement involves the denial of the constitutional right to a trial before a court of law. *Brown v Siang,* 107 Mich App 91; 309 NW2d 575 (1981), *Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981). *Every doubt, therefore, must be resolved in favor of guaranteeing that there was an intentional, willing, and knowing relinquishment or abandonment of this fundamental right."* (Emphasis added.)

We wish to briefly address the significance of two statutory provisions which arguably bear on the issues we have confronted in this case. Under MCL 600.5041(5), 600.5042(4); MSA 27A.5041(5), 27A.5042(4), after signing an arbitration agree-

ment, a patient has 60 days to revoke his decision. Although we approve of the Legislature's inclusion of this protective provision in the statutory scheme, a "right to revoke" cannot be permitted to validate a waiver that was ineffective at the time of its execution. Surely, it cannot be seriously contended that an unknowing, unintelligent, or involuntary waiver of the right against self-incrimination is nevertheless valid if the accused is given 60 days in which to revoke it. We apply a similar approach to the case at bar.

One other statutory provision merits brief discussion. MCL 600.5042(8); MSA 27A.5042(8) and MCL 600.5041(7); MSA 27A.5041(7) provide that "[a]n agreement to arbitrate which includes the provisions of this section shall be presumed valid". We have no difficulty concluding that the Legislature may not validate an otherwise ineffective waiver of constitutional rights merely by providing that such a waiver "shall be presumed valid".[24]

---

[24] In *Ramirez v Superior Court, Santa Clara County,* 103 Cal App 3d 746; 163 Cal Rptr 223 (1980), the California Court of Appeal refused to accord conclusive effect to a similar statutory provision. A hospital that sought to compel arbitration was duly noted as the real party in interest. The court's approach is germane to our present inquiry:

"Real party responds to these arguments by asserting that § 1295 was a legislative response to a health care crisis in California, that arbitration was viewed as a partial solution to the crisis, that public policy favors arbitration over litigation, that arbitration agreements have been upheld against due process arguments, and that such contracts are not contracts of adhesion *because § 1295, subdivision (e) has so decreed.* As far as real party's argument goes, it is accurate and persuasive. However, in all its particulars it assumes that the patient has knowingly and voluntarily signed the agreement or that the agreement was entered [into] by an agent of the patient who was aware of the arbitration provision. *Real party does not address the question of whether § 1295 can properly bind one who has signed the agreement under coercion or without knowledge or understanding of its provisions." Id.,* 755.

The court held that the statutory presumption of validity was not conclusive:

"In light of the constitutional protection for the right to jury trial in civil cases, we conclude that the Legislature may not establish a

## IV

In the following section we shall summarize our holdings in this case.

When a defendant in a malpractice action moves for accelerated judgment on the ground that the plaintiff has executed an arbitration agreement, the trial court shall conduct a hearing. At the hearing, the defendant must affirmatively show that before signing the agreement, the plaintiff was specifically informed: (1) that the form he was being asked to sign was an arbitration agreement, (2) that by signing the form, he would be giving up his right to trial by jury or a judge, (3) that the arbitration panel that would decide his case would include an attorney, a layman, and a doctor or a hospital administrator, (4) that physicians and hospital administrators on arbitration panels may have an incentive to minimize the number and size of malpractice awards, because their malpractice insurance rates are directly affected by those awards, (5) that he did not have to sign the arbitration agreement, (6) that the patient would receive the same quality of medical treatment and would be attended to just as quickly, whether or not he chooses to sign the agreement, (7) that doctors and hospitals are not permitted to refuse treatment to patients who do not sign the agree-

conclusive presumption that one signing an agreement meeting the requirements of § 1295 has in fact consented to arbitration. *We therefore read § 1295 as permitting a party to seek to show that he or she was coerced into signing or did not read the many waiver notices provided and did not realize that the agreement was an agreement to arbitrate.* * * * We do not believe the trial courts will be unduly burdened by the requirement that they make such a factual determination when ruling on a petition to compel arbitration. *To the extent a burden is imposed, the Constitution requires it."* (Emphasis added, footnote omitted.) *Id.,* 756-757.

ment, and (8) that signing the agreement is entirely up to the patient.

If the defendant fails to establish by clear and convincing evidence that plaintiff was so informed (and that he understood the information),[25] the motion for accelerated judgment shall be denied.

If the defendant establishes by clear and convincing evidence that the plaintiff was provided with (and understood) all of the above information, each party shall have an opportunity to present evidence bearing on the voluntariness of plaintiff's execution of the arbitration agreement. Unless the trial court concludes, after consideration of the totality of the circumstances,[26] that the defendant has established by a preponderance of the evidence that the plaintiff executed the agreement voluntarily, the motion for accelerated judgment shall be denied.

## V

In light of our disposition of the waiver issue, we need not address plaintiff's contentions that the medical malpractice arbitration act is unconstitutional and that defendant's motion for accelerated judgment was not timely filed.[27]

Reversed and remanded for further proceedings in accordance with this opinion. No costs. We do not retain jurisdiction.

---

[25] Since the defendant must show that the plaintiff understood the information provided, it would be wise for health care providers to ask all patients whether they have understood everything that they have just been told.

[26] See § II(C), *infra,* for an enumeration of some of the circumstances bearing on this determination.

[27] We note, however, that the latter claim is without merit. GCR 1963, 111.3; *Atkins v Hartford Accident & Indemnity Co,* 7 Mich App 414; 151 NW2d 846 (1967).

D. F. WALSH, J., concurred in result only.

D. C. RILEY, J. *(concurring).* I am in accord with the result reached by Judge MAHER in this matter. I am also in accord with his holding that, when an arbitration agreement is challenged, a hearing must be conducted to determine whether there has been a knowing, intelligent and voluntary waiver of the right to a jury trial, that the burden of establishing a waiver rests with the hospital, and that the guidelines set forth are essential to protect the rights of the patient even though this may mean a case-by-case review of these matters by the trial court.

I write separately because I believe it necessary to concede that there is not yet available sufficient empirical data from which a determination can be made as to whether the medical malpractice act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* is fulfilling its desired purpose and, if so, in a creditable fashion. There is much to suggest that it may not be. We are becoming more and more aware of this from the numerous cases that have come before us in recent months, raising issues that could not have been anticipated when the act was conceived. However, since the facts of this case do not require that we reach this larger issue, I am satisfied to leave it for another day and concur in Judge MAHER's opinion on the issue presented here.