FEINBERG v STRAITH CLINIC

Docket No. 81160. Submitted November 18, 1985, at Detroit. Decided April 22, 1986. Leave to appeal applied for.

Roual B. Feinberg filed a medical malpractice action against Straith Clinic and Enrique Sabbagh in Oakland Circuit Court for alleged injuries sustained during elective cosmetic surgery. The court, David F. Breck, J., granted defendants' motion for accelerated judgment on the ground that the court lacked jurisdiction over the matter because plaintiff had agreed to arbitrate any claims arising out of his medical care and that plaintiff had not sustained his burden of proving the invalidity of the arbitration agreements. Plaintiff appealed. *Held:*

1. The trial court correctly found that the burden of proof was on plaintiff to prove the arbitration agreements invalid, and the court's findings of fact and its resort to the burden of proof as to whether the arbitration agreements were void under the Malpractice Arbitration Act are not clearly erroneous.

2. Plaintiff's failure to read the arbitration agreements before signing them does not free him from their operation.

3. Plaintiff's contention that the arbitration agreements are ineffective in the absence of a voluntary, knowing and intelligent waiver of his constitutional rights is rejected. A standard for waiver of a jury trial requiring only voluntariness sufficiently accommodates the various interests involved in this case. Plaintiff had the ability and the opportunity to read the arbitration agreements before signing them. Although he may not have been knowledgeable of the consequences of signing the arbitration agreements, plaintiff's choice to do so was voluntary.

Affirmed.

1. ACTIONS — MEDICAL MALPRACTICE — ARBITRATION — VALIDITY OF ARBITRATION AGREEMENTS — BURDEN OF PROOF.

A plaintiff in a medical malpractice action seeking to have

REFERENCES

Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 162, 205, 266, 374, 376.

Arbitration of medical malpractice claims. 84 ALR3d 375.

arbitration agreements declared invalid has the burden of proving those agreements invalid; it is not up to the defendant under those circumstances to prove that the plaintiff waived his constitutional right to court access.

2. ACTIONS — MEDICAL MALPRACTICE — ARBITRATION — VALIDITY OF ARBITRATION AGREEMENTS.

The fact that an individual signed a medical malpractice arbitration agreement without first reading the agreement does not free him from its operation; by signing the agreement, the individual has voluntarily waived any constitutional rights he may have to a jury trial on any issue arising out of the medical treatment to which the agreement pertains; such voluntary waiver is sufficient to support a finding that the arbitration agreement is valid where it complies with the Malpractice Arbitration Act, was approved by the Commissioner of Insurance, and is boldly labeled "Arbitration Agreement" (MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.).*

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw),* for plaintiff.

*Melvin R. Schwartz* and *Laura Dunbar Kellett,* for defendant.

Before: WAHLS, P.J., and R. B. BURNS and M. E. DODGE,* JJ.

PER CURIAM. Plaintiff commenced a medical malpractice suit against defendants for alleged injuries sustained during elective cosmetic surgery. Defendants moved for accelerated judgment, pursuant to GCR 1963, 116.1(2) and on the basis that plaintiff had agreed to arbitrate any claims arising out of his medical care. Following an evidentiary hearing, the circuit court concluded that plaintiff had not sustained his burden of proving the invalidity of the arbitration agreements. The court granted defendants' motion and dismissed plaintiff's suit. Plaintiff appeals as of right.

* Circuit judge, sitting on the Court of Appeals by assignment.

Plaintiff underwent surgery in mid-January, 1979. However, he first went to Straith Clinic and signed the arbitration agreements on November 21, 1978. Plaintiff does not dispute the validity of his signatures on either agreement. He contends, however, that he did not read the agreements but blindly signed whatever the admitting personnel indicated required his signature. Plaintiff further asserts that he did not receive an information brochure as required by MCL 600.5041(6), 600.5042(7); MSA 27A.5041(6), 27A.5042(7).

Nancy Terrian testified that she was the receptionist at Straith Clinic in 1978. She explained the routine at the clinic as follows. When a patient signed in, she would give the patient a general information form to fill in. When the patient returned the form, she would give the patient a package of forms. This package consisted of a cover letter, a health questionnaire and the arbitration agreements all inserted in an information brochure. Terrian would prepare a number of these packages in advance so that they would be available as needed to give to patients throughout the day. Terrian would identify the different forms in the package to the patient but apparently did not give any further information about them. Upon receiving the package of forms, the patient would wait for the photographer. The photographer would take pictures of the patient as a preliminary step to cosmetic surgery and would then give the patient the appropriate consent forms. The patient would then wait to see a doctor, who would conduct an examination, explain what surgery could or ought to be done, and answer questions. Upon electing surgery, the patient would see one of the administrative staff, who would take care of the remaining paperwork and schedule a date for surgery.

Terrian also testified that she had an excellent memory for names and faces and specifically remembered plaintiff, notwithstanding that more than five years had passed between the time that he came to Straith Clinic and the evidentiary hearing. Terrian claimed that she specifically remembered that she gave plaintiff an information brochure.

Patricia Dienfenbach testified that she was the assistant office manager who witnessed plaintiff's signatures on November 21, 1978. She had no independent recollection of plaintiff but testified regarding her routine as follows. When a patient left the doctor's office, she would call the patient in and ask for all the forms. She would then discuss the cost of surgery and how payment was to be made. If the patient desired to schedule a surgery date, she would hand back the consent forms to be filled in and signed. When the patient was done with those, she would hand back the arbitration agreements and information brochure for signing if the patient wished to sign them. While the patient was signing forms, she would find a suitable date for surgery and fill in the admitting papers. She would then give all the forms to the patient and go through them one by one explaining what each was.

As indicated above, Diefenbach had no recollection of plaintiff from November 21, 1978. However, she testified that she had marked on plaintiff's chart that he had signed the consent forms and received the health questionnaire, arbitration agreements and admitting papers. The chart did not have a place to indicate that the information brochure had been given.

Plaintiff testified that he was the secretary and treasurer for a company and his salary was $100,000. His employment involved sales, adver-

tising, office procedures and signing contracts. His wife and her girlfriend had successfully undergone cosmetic surgery at Straith Clinic, so he expected the same for himself. Accordingly, he signed the various papers presented to him just to get the surgery. Plaintiff admitted that he glanced over the documents given him but testified that he did not understand quite a bit of the material. However, he denied reading the arbitration agreements. He further denied receiving an information brochure, although, on further questioning, he stated that he did not recall receiving a brochure.

As evidence that he did not read the arbitration agreements, plaintiff brought attention to the manner in which he had signed one of the forms. An "x" had been placed by each of three lines calling for his printed name, signature and address. In filling in the lines, plaintiff signed his name three times.

At the close of the evidence, the trial court ruled as follows:

Well, let me say at the outset that I initially was impressed with how thorough the Clinic has tried to be in protecting themselves. Specifically I'm impressed with the fact that they require the patient to write out on the consent forms certain language. However, I'm also convinced that matters become routine after awhile and I cannot accept Mrs. Terrian's testimony today that she definitely remembers Mr. Feinberg from back in '78 and early '79. He has a very distinctive first name which she was not able to recall and did not recall her earlier testimony today that she had been asked about Mr. Rothenberg. That perhaps is no great fault because a couple of us didn't remember that either.

I'm satisfied that Mr. Feinberg even though an officer of a corporation who signs contracts frequently, I'm satisfied that he was particularly

nervous about this procedure and did not read over the instruments. And so the fact that the arbitration agreements, Exhibit One and Two state that he received a copy of the booklet, it's not probative of the fact that he either did or did not receive it because I find that he didn't read those agreements over. It's unfortunate; we really ought to be stuck by those kinds of mistakes that we make in our lives, but the law doesn't so hold at least in this type of hearing because the issue is whether or not he got the booklet. But I think there's good evidence of the fact that he didn't read these matters over by the fact that he signed his signature three times; when he signed it where it says patient's address and says print it in and he signed it there and he signed it where it had the address in addition to the place for his signature.

I'm also mindful of the fact that and it's evidence I believe of how routine these matters become, that these arbitration agreements have been stamped with signatures by the various people involved and that is Vivian Raybald (sic) whose signature appears on the arbitration agreement was never even there.

Now there's the testimony of the Plaintiff that he testified he didn't recall whether or not he received the booklet but he also testified that he did not receive the booklet.

For the reasons that I have stated, I find that I have to discount to a great extent the testimony of both the Plaintiff and Miss Terrian so as far as I'm concerned, it's a toss up gentlemen on whether or not he got the booklet and therefore, the issue is who has got the burden of proof . . . .

\*    \*    \*

And in the *Morris* [*Morris v Metriyakool,* 418 Mich 423; 344 NW2d 736 (1984)] case, it appears that the Supreme Court is saying that the burden is on the Plaintiff. Page 10 of the slip opinion case: "Therefore, the burden of disproving this arbitration agreement rests with the Plaintiffs." That seems to be just; it seems to require that a person

not sign papers without reading them over first and that's the penalty that's imposed for not doing so, at least that's this Court's finding. So I'm going to find that Plaintiff has not maintained its burden of proof of convincing this Court that he did not receive the arbitration booklet. Therefore, this case will be sent to arbitration.

Contrary to the trial court's conclusion, *Morris v Metriyakool,* 418 Mich 423, 439; 344 NW2d 736 (1984), is not dispositive of the issue of who must prove that an information brochure was or was not received. First, the language in *Morris* quoted by the court was adopted by only two of the justices. The remaining justices did not express an opinion on who had the burden of proof. See *Aluia v Harrison Community Hospital (On Remand),* 139 Mich App 742; 362 NW2d 783 (1984). Second, the quoted language assumes an arbitration agreement that conforms with the requirements of the Malpractice Arbitration Act. In the instant case, conformity with the statute is in dispute. Although the trial court's reliance on *Morris* was thus misplaced, we will not reverse if we conclude that the court nevertheless reached the correct result. *Robert J Eliassen & Sons v Livonia,* 55 Mich App 596, 599; 223 NW2d 84 (1974).

Since the Supreme Court decided *Morris,* this Court has been presented with numerous appeals involving the validity of medical malpractice arbitration agreements. The cases reveal a decided difference of opinion among the members of this Court as to who carries the burden of proof. Contrast *Kunath v Sinai Hospital of Detroit,* 149 Mich App 32; — NW2d — (1986) (burden on plaintiff to prove agreement invalid), with *Guertin v Marrella,* 149 Mich App 420; — NW2d — (1986) (burden on defendant to prove plaintiff waived constitutional right to court access). We believe that the burden

is properly on plaintiff in accordance with the general rule that the burden of persuasion is allocated between the parties on the basis of the pleadings. *Kar v Hogan,* 399 Mich 529, 539; 251 NW2d 77 (1976). Here, plaintiff holds the affirmative on the issue of the invalidity of the arbitration agreement. GCR 1963, 111.7; see now MCR 2.111(F)(3). Accordingly, we agree with the trial court that the burden of proof was on plaintiff. Furthermore, the court's findings of fact and its resort to the burden of proof as to whether the arbitration agreements were void under the act are not clearly erroneous.

Given then that the agreements are signed by plaintiff and conform to the requirements of the Malpractice Arbitration Act, is plaintiff nevertheless entitled to relief? MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27.5042(8) state that agreements which include the provisions of the act shall be presumed valid. But plaintiff asserted, and the trial court found, that plaintiff did not read the agreements. The trial court's finding was not clearly erroneous. The specific question then is whether plaintiff's failure to read the agreements frees him from their operation. In *Moffit v Seder-lund,* 145 Mich App 1, 8; 378 NW2d 491 (1985), this Court stated:

> Generally, a failure to read a written contract document does not require rescission of the contract unless other facts indicate fraud, artifice, or deception. See, for example, *Vandendries v General Motors Corp,* 130 Mich App 195, 200; 343 NW2d 4 (1983). Failure to read a contract document provides a ground for rescission only where the failure was not induced by carelessness alone, but instead was induced by some stratagem, trick or artifice by the parties seeking to enforce the contract. *Otto Baedeker & Associates, Inc v Ham-*

*tramck State Bank,* 257 Mich 435, 441; 241 NW 249 (1932).

See also *International Transportation Ass'n v Bylenga,* 254 Mich 236, 239; 236 NW 771 (1931); *Ditzik v Schaffer Lumber Co,* 139 Mich App 81, 89; 360 NW2d 876 (1984). However, this case involves more than mere contract law. *D H Overmyer Co, Inc, of Ohio v Frick Co,* 405 US 174, 183; 92 S Ct 775; 31 L Ed 2d 124 (1972).

Plaintiff contends that the arbitration agreements are ineffective in the absence of a voluntary, knowing and intelligent waiver of his constitutional rights. Whether such strict waiver requirements apply in the civil law has not been resolved by the United States Supreme Court although the issue was presented in two cases. In *D H Overmyer Co, supra,* pp 185-186, the Court concluded that, even if it assumed that the standard for waiver in a corporate property right case "is the standard applicable to waiver in a criminal proceeding, that is, that it be voluntary, knowing, and intelligently made," that standard was fully satisfied on the facts of the case. The Court was presented with a case at the opposite end of the spectrum in *Fuentes v Shevin,* 407 US 67; 92 S Ct 1983; 32 L Ed 2d 556 (1972), where the Court concluded that the alleged waiver provision did not, on its face, even amount to a waiver. In the absence of clear guidance from the Supreme Court, lower courts have generally applied the strict requirement of a voluntary, knowing and intelligent waiver. See *KMC Co, Inc v Irving Trust Co,* 757 F2d 752 (CA 6, 1985), and cases cited therein.

"[T]here is no universal standard that must be applied in every situation where a person forgoes a constitutional right." *Schneckloth v Bustamonte,* 412 US 218, 245; 93 S Ct 2041; 36 L Ed 2d 854

(1973). A strict standard requiring a voluntary, knowing and intelligent waiver has been applied to rights which are guaranteed to a criminal defendant in order to preserve a fair trial. *Id.,* p 237. These rights include the rights to counsel, to confrontation, to a jury trial, to a speedy trial and to be free from twice being placed in jeopardy. *Id.,* pp 237-238.

In *Schneckloth, supra,* the Supreme Court had to decide what consent to search meant in the Fourth and Fourteenth Amendment context. The Court noted "a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." *Id.,* p 241. Quoting language from its prior opinions, the Court pointed out that the Fourth Amendment protects the security of one's privacy against arbitrary intrusion by the police and that there is no likelihood of unreliability in a search and seizure case. *Id.,* p 242. Ultimately, the Court was satisfied that the requirement of a "voluntary" consent reflected a fair accommodation of the constitutional requirement that consent searches be free from any aspect of official coercion. *Id.,* p 229. The Court also concluded that it is not necessary to indulge every reasonable presumption against voluntary relinquishment. *Id.,* p 243. The Court rejected the strict requirements of a "knowing" and "intelligent" waiver but concluded that an accused's state of mind is a factor to be evaluated as part of the totality of circumstances. *Id.,* p 227.

There is a certain appeal in a conclusion that, as the strict standard of waiver applies to the right to a jury trial in the criminal context, so should the strict standard apply in the civil context. However, we believe that such a result should be rejected here. Const 1963, art 1, § 14 states in relevant

part: "The right of trial by jury shall remain, but shall be waived in all civil cases unless demanded by one of the parties in the manner prescribed by law." See MCR 2.508. US Const, Am VII, while not expressly providing that a civil jury trial is waived unless demanded has been construed to nevertheless permit such a waiver. See *KMC Co, supra,* p 756, n 4, and FR Civ P 38(d). The waiver of jury trial by failure to timely demand it can in no sense be characterized as a knowing and intelligent waiver. It can, however, be characterized as "voluntary," which includes the concept of implied consent or waiver. See *Employees of the Dep't of Public Health & Welfare of Missouri v Missouri Dep't of Public Health & Welfare,* 411 US 279, 295-296; 93 S Ct 1614; 36 L Ed 2d 251 (1973) (Marshall, J., concurring in result).

Another distinction can be seen in the application of the federal rights to jury trial to the states through the Fourteenth Amendment. In *Duncan v Louisiana,* 391 US 145, 149 and n 14; 88 S Ct 1444; 20 L Ed 2d 491 (1968), the Supreme Court concluded that trial by jury in criminal cases is a fundamental right, meaning that it is a procedure "necessary to an Anglo-American regime of ordered liberty." In doing so, the Court rejected dicta in some of its earlier cases asserting that the right to jury trial is not essential to ordered liberty and may be dispensed with by the states regardless of the Sixth and Fourteenth Amendments. *Id.,* pp 154-155. Accordingly, the Court held that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." *Id.,* p 149. In the civil context, the right of jury trial has also been termed "fundamental." *Aetna Ins Co v Kennedy,* 301 US 389, 393; 57 S Ct 809; 81 L Ed 1177 (1937).

However, it is questionable whether the right to a civil jury trial is "fundamental" other than in the sense that it is a constitutionally guaranteed right. In any event, the Seventh Amendment has not been applied to the states by the Fourteenth Amendment. *Woods v Holy Cross Hospital*, 591 F2d 1164, 1171, n 12 (CA 5, 1979).

Although we are not bound by the Seventh Amendment, we are aware of no reason why we should construe Const 1963, art 1, § 14 differently from its federal counterpart. Both provisions are intended to preserve the right to a civil jury trial as it existed at common law. Indeed, were we to construe our state provision as allowing a lesser standard for waiver than the federal constitution, we would clearly pave the way for forum-shopping by nonresident plaintiffs, who would likely choose the federal forum in favor of the greater likelihood of court access there.

In *KMC Co, supra,* a panel of the Sixth Circuit Court of Appeals addressed the issue of what standard applies to waiver of the right to a civil jury trial. The panel was of the opinion that, to be valid, a waiver must be voluntary, knowing and intelligent. *Id.,* p 756. That opinion was dictum, however, as the panel went on to state that, pursuant to a standard requiring no more than that the waiver at least be "clear", the jury waiver provision under consideration was still invalid. *Id.,* p 757. Even assuming the correctness of the dictum in *KMC Co,* we find that case distinguishable. As is true here, *KMC Co* involved a contractual waiver entered into before any cause of action had arisen. In *KMC Co,* though, the waiver occurred in the final sentence of the eleventh paragraph of a financing agreement—one seemingly minor part of a commercial transaction. Furthermore, the plaintiff offered parol evidence of an oral agreement

affecting the application of the written waiver. In contrast, the contractual waiver involved in the instant case reflects a legislative response to a medical malpractice crisis in this state. In the Malpractice Arbitration Act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* the Legislature has provided safeguards to ensure the fairness of the arbitration agreements and of the arbitration process. The arbitration agreements signed by plaintiff in this case complied with the statute, were approved by the Commissioner of Insurance and were one-page agreements boldly labeled "ARBITRATION AGREEMENT." In this context, we believe that a standard for waiver requiring voluntariness sufficiently accommodates the various interests involved.

Under the "voluntary" standard, there is some room for application of the concept of constructive notice. This case is a proper candidate for such application. Plaintiff had the ability and opportunity to read the arbitration agreements. To some extent, he was nervous, although he had a friend with him for emotional support. An important factor, though, is that plaintiff was somewhat nonchalant or careless about the admission procedure because his wife and her friend had undergone successful cosmetic surgery through the same clinic. Although plaintiff may not have been knowledgeable of the consequences of signing the arbitration agreement, his choice to do so was voluntary.

Affirmed.