McKINSTRY v VALLEY OBSTETRICS-GYNECOLOGY CLINIC, PC

GUERTIN v MARRELLA

Docket Nos. 77531, 78140. Argued January 14, 1987 (Calendar Nos. 7-8). Decided May 8, 1987.

Thomas McKinstry and Kathleen L. McKinstry, for herself and as next friend of Amanda McKinstry, a minor, brought an action in the Saginaw Circuit Court against Valley Obstetrics-Gynecology Clinic, P.C., and Saginaw General Hospital, seeking damages for injuries arising out of the alleged negligent delivery of Amanda. The court, Hazen R. Armstrong, J., granted accelerated judgment for the defendants and ordered arbitration as provided under an arbitration agreement, signed by Kathleen McKinstry, pursuant to the Malpractice Arbitration Act. The Court of Appeals, R. B. BURNS and WAHLS, JJ. (DANHOF, C.J., dissenting), reversed, holding that the act was unconstitutional (Docket No. 56124). The Supreme Court vacated the judgment of the Court of Appeals in light of *Morris v Metriyakool,* 418 Mich 423 (1984), and remanded the case to the Court of Appeals. 419 Mich 873 (1984). The Court of Appeals, in turn, remanded the case to the trial court for an evidentiary hearing to determine whether the hospital had complied with the statutory mandates of the act when offering the arbitration agreements to Kathleen McKinstry. On remand, the court, Robert L. Kaczmarek, J., found that the defendants had complied with the act and that the agreements were valid on their faces and granted accelerated judgment for the defendants. After remand, the Court of Appeals, DANHOF, C.J., and R. B. BURNS and WAHLS, JJ., affirmed in an opinion per curiam (Docket No. 78811). The plaintiffs appeal.

Robert L. Guertin brought an action in the Macomb Circuit Court against Basil Marrella, D.P.M., Thomas Bauder, D.P.M., and Hutzel Hospital—Warren Division, alleging medical malprac-

REFERENCES

Am Jur 2d, Arbitration and Award §§ 1, 6, 7, 8, 11, 12, 15, 20, 41, 57, 62, 63, 75.

Am Jur 2d, Physicians, Surgeons, and Other Healers § 376.

Arbitration of medical malpractice claims. 84 ALR3d 375.

Constitutionality of arbitration statutes. 55 ALR2d 432.

tice arising from surgery on his foot. The court, Frank E. Jeannette, J., granted accelerated judgment for the defendants and ordered arbitration as provided in an arbitration agreement pursuant to the Malpractice Arbitration Act. The Court of Appeals, M. J. KELLY, P.J., and BRONSON and SIMON, JJ., reversed and remanded in an opinion per curiam, holding that the trial court had improperly placed the burden of proving the invalidity of the arbitration agreement on the plaintiff (Docket No. 81134). The defendants appeal.

In an opinion by Justice GRIFFIN, joined by Chief Justice RILEY and Justices LEVIN, BRICKLEY, and BOYLE, the Supreme Court *held:*

The burden of establishing the existence of an arbitration agreement that conforms to the strict requirements of the Malpractice Arbitration Act rests with the party seeking to enforce the agreement. Once prima facie evidence of such an agreement has been presented, the statutory presumption of validity accrues, and the burden of going forward with evidence to rebut the presumption shifts to the party seeking to avoid the agreement. The parent of an unborn child, by entering such an agreement, can bind the child, after birth, to arbitrate disputes which arise out of the prenatal care and delivery of the child.

1. The Malpractice Arbitration Act provides that a health care provider may, and a hospital must, offer to arbitrate disputes arising from the provision of health care. In order for an arbitration agreement to be enforceable under the act: the offer to arbitrate must be in writing; must, for sixty days, be revocable by the patient in writing; and must state above the signature line in twelve-point boldface type that the agreement is not a prerequisite to health care treatment and may be revoked within sixty days. The patient must be given a copy of the arbitration agreement and a booklet detailing the specific provisions of the agreement, and, in addition, the offer to arbitrate must not precede the provision of emergency medical care. An agreement to arbitrate which conforms strictly to these requirements is presumed valid.

2. A hospital or health care provider that has pleaded the existence of a valid arbitration agreement bears the initial burden of going forward with evidence establishing that the arbitration agreement was executed in strict compliance with the Malpractice Arbitration Act. The statutory presumption of validity accrues once the defendant offers evidence that a written arbitration agreement complying with the provisions of the act has been signed by the person who received health care

or treatment or a legal representative and that the agreement otherwise was executed in strict compliance with the statute. If the trial court determines that the agreement complies with the act and that other independent evidence demonstrates that the patient has been given a copy of both the agreement and booklet in a nonemergency setting, the agreement is presumed valid. Once a showing is made that gives rise to the presumption, it will stand unless rebutted by evidence that either demonstrates noncompliance with the statutory provisions or establishes one or more defenses, such as coercion, mistake, duress, or fraud.

3. Evidence of habit or routine of a hospital or health care provider is relevant to establish that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

4. The health care provider does not have the burden of proving by clear and convincing evidence that the patient knowingly, intelligently, and voluntarily waived the right to trial. A person's decision to arbitrate a medical malpractice dispute and the consequential waiver of a jury trial is not tantamount to a deprivation of a fundamental constitutional right. The right to a jury trial in a civil action is permissive, not absolute. The presumption of validity of an arbitration agreement is not only an evidentiary rule of procedural convenience, but also is one grounded in reality.

5. The Malpractice Arbitration Act changed the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child. The statute was intended to allow parents to bind children to arbitration, rather than to permit subsequent avoidance of arbitration at the age of majority. A minor child born after parental consent to arbitration cannot be distinguished from a minor child born prior to parental consent. Neither a fetus in utero nor a minor child has the capacity to contract for medical care and can only do so through a parent or guardian.

6. In *Guertin*, the plaintiff failed to prove noncompliance with the act. The trial court did not clearly err in evaluating the evidence before it and in placing the burden of going forward with evidence to invalidate a conforming arbitration agreement upon the plaintiff.

7. In *McKinstry*, the validity of the arbitration agreements was established. The defendants made a prima facie showing of compliance with the act, and the plaintiffs failed to go forward with sufficient evidence to rebut the presumption of validity. Kathleen McKinstry was in sufficient physical and mental

condition to sign the agreements and did so in a nonemergency setting. In addition, Amanda McKinstry was bound by the agreement signed by her mother.

*McKinstry,* affirmed.

*Guertin,* reversed.

Justice ARCHER, dissenting in *Guertin* only, stated that the burden of establishing the existence of an arbitration agreement that conforms to the strict requirements of the Malpractice Arbitration Act should be placed on the health care provider to prove by clear and convincing evidence that the patient knowingly, intelligently, and voluntarily waived rights to court access and to revoke the agreement within sixty days.

Access to the courts is a fundamental right. In civil cases, courts must indulge every reasonable presumption against waiver of a fundamental right; there can be no presumption of acquiescence to the loss of a fundamental right. The Malpractice Arbitration Act provides that an agreement to arbitrate is to be presumed valid, but does not provide a presumption that the waiver contained is knowing and voluntary. The presumption of validity is rebuttable in that once a patient contends that an alleged waiver of constitutional rights was unknowing, involuntary, or unintelligent the presumption disappears and the burden remains with the health care provider to show the contrary. For a health care provider to rely on rote testimony of habit and custom as evidence of a waiver does not sustain the burden of producing clear, positive, and credible evidence that the statutory safeguards to ensure the fairness of the arbitration process have been strictly followed. The burden of proving a knowing and voluntary waiver should be placed on the party which can best meet it—the health care provider.

Justice CAVANAGH dissented on the basis of his view of the statute as expressed in *Morris v Metriyakool,* 418 Mich 423 (1984).

146 Mich App 307; 380 NW2d 93 (1985) affirmed.

149 Mich App 420; 385 NW2d 805 (1986) reversed.

1. ARBITRATION — MALPRACTICE ARBITRATION ACT — BURDEN OF PROOF — PRESUMPTION OF VALIDITY.

The burden of establishing the existence of an arbitration agreement that conforms to the strict requirements of the Malpractice Arbitration Act rests with the party seeking to enforce the agreement; once prima facie evidence of such an agreement has been presented, the statutory presumption of validity accrues, and the burden of going forward with evidence to rebut the presumption then shifts to the party seeking to avoid the agreement (MCL 600.5041 *et seq.;* MSA 27A.5041 *et seq.*).

2. Arbitration — Malpractice Arbitration Act — Arbitration Agreements — Enforceability — Presumption of Validity.

An arbitration agreement is enforceable and presumed valid where: the agreement complies with the provisions of the malpractice arbitration act, is in writing, has been signed by the person who received health care or treatment or a legal representative, is revocable in writing for sixty days, states above the signature line in twelve-point boldface type that the agreement to arbitrate is not a prerequisite to health care treatment and may be revoked within sixty days; the patient is given a copy of the arbitration agreement and a booklet detailing the specific provisions of the agreement; and the offer to arbitrate does not precede the provision of emergency medical care (MCL 600.5041, 600.5042; MSA 27A.5041, 27A.5042).

3. Arbitration — Malpractice Arbitration Act — Habit and Routine.

In an action challenging the validity of a malpractice arbitration agreement, evidence of habit or routine of a hospital or health care provider is relevant to establish that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice (MCL 600.5041 *et seq.;* MSA 27A.5041 *et seq.*).

4. Arbitration — Constitutional Law — Malpractice Arbitration Act.

A decision to arbitrate a medical malpractice dispute and the consequential waiver of a jury trial is not tantamount to a deprivation of a fundamental constitutional right; the right to a jury trial in a civil action is permissive, not absolute (US Const, Am VII, Const 1963, art 1, § 14).

5. Arbitration — Malpractice Arbitration Act — Unborn Children.

The parent of an unborn child can bind the child, after birth, to arbitrate disputes which arise out of the prenatal care and delivery of the child (MCL 600.5041 *et seq.;* MSA 27A.5041 *et seq.*).

*Charfoos & Christensen, P.C.* (by *Sharon S. Lutz* and *David R. Parker*), for plaintiffs McKinstry.

*Colista, Urso, Adams & Dettmer, P.C.* (by *Constance J. Allen*), for plaintiff Guertin.

*McGraw & Borchard, P.C.* (by *Patrick J. Mc-Graw*), for defendant Valley Obstetrics-Gynecology Clinic, P.C.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Stephen M. Kelley* and *Susan Healy Zitterman*), for defendant Saginaw General Hospital.

*Vandeveer, Garzia, Tonkin, Kerr, Heaphy, Moore, Sills & Poling, P.C.* (by *Robert D. Brignall*), for defendant Marrella.

*Franklin, Bigler, Berry & Johnston, P.C.* (by *Lisa C. DeGryse*), for defendants Bauder and Hutzel Hospital.

Amici Curiae:

*Kerr, Russell & Weber* (by *Louis G. Corey* and *Richard D. Weber*) for Michigan State Medical Society.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw*) for Michigan Trial Lawyers Association.

GRIFFIN, J. The two cases before us are representative of a conflict that exists in this state among courts as well as litigants. The principal issue is usually posed in terms of who must bear the "burden of proof" in establishing the validity (or invalidity) of an arbitration agreement signed pursuant to the Medical Malpractice Arbitration Act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.* (MMAA).

Because the Legislature in fashioning the MMAA took pains to declare that an arbitration agreement which conforms to the statute's requirements

"shall be presumed valid,"[1] we believe the underlying question may be recast as follows:

What is the evidentiary effect of this statutory presumption upon the respective burdens of the parties in a suit for malpractice where jurisdiction is challenged on the ground that claims involved must be submitted to arbitration in accordance with the MMAA?

We hold that the burden of establishing the existence of an arbitration agreement that conforms to the strict requirements of the statute rests with the party seeking to enforce the agreement. Once prima facie evidence of such an agreement has been presented, the statutory presumption of validity accrues, and the burden of going forward with evidence to rebut the presumption then shifts to the party seeking to avoid the agreement.

We are also asked to decide in *McKinstry* whether the parent of an unborn child can bind the child, after birth, to arbitrate disputes which arise out of the prenatal care and delivery of the child. We answer the question in the affirmative.

We begin our analysis with a review of the facts and procedural background of the two cases involved in this appeal.

I

*McKINSTRY v VALLEY OBSTETRICS-GYNECOLOGY CLINIC, PC*

On October 17, 1978, plaintiff Kathleen (Mrs. Thomas) McKinstry was admitted to Saginaw General Hospital by employees of Valley Obstetrics-

---

[1] MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27A.5042(8) state: "An agreement to arbitrate which includes the provisions of this section shall be presumed valid."

Gynecology Clinic, P.C. She was suffering from a pregnancy complication, the symptoms of which included high blood pressure, headaches, dizziness, and the appearance of spots before her eyes. Upon admission to the hospital, Mrs. McKinstry signed two arbitration agreements, one in her name, and one in the name of "Baby or Babies McKinstry." During her hospital stay, Mrs. McKinstry gave birth to a daughter, Amanda, who suffered a shoulder and arm injury known as Erb's Palsy. After she and Amanda were discharged from the hospital, Mrs. McKinstry did not revoke either of the arbitration agreements within the sixty-day period provided for by the agreements and MCL 600.5042(3); MSA 27A.5042(3). Plaintiff Thomas McKinstry was not a party to the agreements.

On February 27, 1980, plaintiffs Kathleen McKinstry, Thomas McKinstry, and Kathleen McKinstry as next friend of Amanda McKinstry, a minor, filed a complaint in Saginaw Circuit Court against Valley Obstetrics-Gynecology Clinic, P.C., and Saginaw General Hospital, seeking damages arising out of the alleged negligent delivery of Amanda McKinstry. Motions by the defendants for accelerated judgment on the basis of the two arbitration agreements were granted by the trial court.

The Court of Appeals reversed the decision of the trial court and remanded the case for trial, holding that the MMAA was unconstitutional because the statutory agreement form failed to advise patients adequately as to how the arbitration panel would be selected. See *McKinstry v Valley Obstetrics-Gynecology Clinic, PC,* 120 Mich App 479; 327 NW2d 507 (1982), vacated and remanded 419 Mich 873 (1984).

The Court vacated that judgment in light of *Morris v Metriyakool,* 418 Mich 423; 344 NW2d

736 (1984), and remanded the case to the Court of Appeals for consideration of other issues raised by plaintiffs.

The Court of Appeals then remanded the case to the trial court to conduct an evidentiary hearing to determine whether defendant hospital had complied with the statutory mandates of the MMAA when offering the arbitration agreements to Mrs. McKinstry.

Such a hearing was held, and the trial court found that the signed arbitration agreements were valid on their faces and that plaintiffs had failed in their burden to avoid the agreements.

This case was then returned to the Court of Appeals, and that Court upheld the trial court's grant of accelerated judgment for defendants. *McKinstry v Valley Obstetrics-Gynecology Clinic, PC (After Remand),* 146 Mich App 307; 380 NW2d 93 (1985). Upon application, leave was granted to appeal to this Court.

II

*GUERTIN v MARRELLA*

The plaintiff Robert Guertin underwent corrective foot surgery in December, 1979, at Hutzel Hospital—Warren Division. In April, 1983, plaintiff filed the instant suit against defendants Basil Marrella, D.P.M., Thomas Bauder, D.P.M., and Hutzel Hospital—Warren Division because of his dissatisfaction with the surgical results. The defendants moved for accelerated judgment or, in the alternative, for an order compelling arbitration on the basis of a December 12, 1979, arbitration agreement signed by the plaintiff.

An evidentiary hearing was held to determine the validity of the arbitration agreement. At the

outset, the trial court ruled that the agreement must be presumed valid since it conformed to the statutory requirements. Later, the trial court found that the plaintiff had failed to present sufficient evidence that the agreement had been the product of fraud or misrepresentation and ordered arbitration. Plaintiff appealed.

The Court of Appeals reversed, holding that the trial court had improperly placed upon plaintiff the burden of proving the invalidity of the arbitration agreement. *Guertin v Marrella,* 149 Mich App 420; 385 NW2d 805 (1986). The case was remanded for further proceedings because the Court of Appeals could not say "that, had the burden been properly placed with the defendant, the ruling of the trial court would have been the same." *Id.,* p 424.

Defendants then applied for, and this Court granted, leave to appeal.

III

Sections 5041 and 5042 of the MMAA provide that a "health care provider" may, and a "hospital" must, offer to arbitrate disputes arising from the provision of health care. In order to be enforceable under the MMAA, the offer must be made in compliance with the following statutory conditions:[2]

(1) The offer to arbitrate must be in writing;
(2) The offer, if accepted by the patient, must, for sixty days, be revocable in writing;
(3) The agreement must state, above the signature line in twelve-point boldface type: "THIS AGREEMENT TO

[2] The requirements set forth in §§ 5041 and 5042 are not identical. A fair interpretation of the MMAA, however, requires that we read these sections in tandem when defining statutory compliance in the context of the present dispute.

ARBITRATE IS NOT A PREREQUISITE TO HEALTH CARE OR
TREATMENT AND MAY BE REVOKED WITHIN 60 DAYS AFTER
EXECUTION BY NOTIFICATION IN WRITING" TO _____;

(4) The patient must be given a booklet detailing the specific provisions of the arbitration agreement;

(5) The patient must be given a copy of the arbitration agreement; and

(6) The offer to arbitrate must not precede the provision of emergency medical care. MCL 600.5041, 600.5042; MSA 27A.5041, 27A.5042.

As already noted, the Legislature took care to provide that an agreement to arbitrate which conforms to the statute's requirements "shall be presumed valid." MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27A.5042(8).[3]

Plaintiffs in the cases before us argue that enforcement of such an arbitration agreement would deprive them of constitutional rights to a jury trial and court access, and thus maintain that the burden should rest upon the defendants to show a valid contract. Plaintiffs cite *Moore v Fragatos,* 116 Mich App 179; 321 NW2d 781 (1982), in which a panel of the Court of Appeals viewed the arbitration agreement as a waiver of a constitutional right and reasoned that existence of such a waiver is never presumed, but requires an affirmative showing that the waiver was made knowingly, intelligently, and voluntarily. The *Moore* Court placed the burden on the defendant to demonstrate by such an affirmative showing that the plaintiff had waived his rights.[4]

[3] The existence of a binding agreement to arbitrate is a condition precedent to the exercise of the court's jurisdiction to enter judgment on an award under the MMAA. The existence of a contract and the enforceability of its terms is a judicial question. *Arrow Overall Supply Co v Peloquin Enterprises,* 414 Mich 95, 98-99; 323 NW2d 1 (1982).

[4] Certain panels of the Court of Appeals have followed the *Moore* analysis. See *DiPonio v Henry Ford Hosp,* 109 Mich App 243, 250; 311 NW2d 754 (1981), lv den 413 Mich 904 (1982), *Gale v Providence*

In response, defendants contend that arbitration is a matter of contract and that one who signs a written agreement is presumed to understand it. Under the act, an agreement which conforms to statutory requirements is presumed to be valid, MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27A.5042(8). Defendants therefore argue that the burden of proving the invalidity of the arbitration agreement rests with plaintiffs.[5]

Prior analysis has accorded little weight to the evidentiary aspects of this issue. The essence of the matter at hand, however, involves an assessment of the evidentiary effect of this statutory presumption upon the respective burdens otherwise borne by the parties. We thus momentarily bypass constitutional and policy concerns which have preoccupied courts before us and revisit basic evidence principles regarding presumptions and the burden of proof.

The term "burden of proof" encompasses two separate meanings. 9 Wigmore, Evidence (Chad-

_Hosp,_ 118 Mich App 405; 325 NW2d 439 (1982), _Manuel v Pierce,_ 121 Mich App 364; 328 NW2d 633 (1982), _Roberts v McNamara-Warren Community Hosp,_ 138 Mich App 691; 360 NW2d 279 (1984), and _Aluia v Harrison Community Hosp (On Remand),_ 139 Mich App 742, 748; 362 NW2d 783 (1984).

[5] In support of this rationale, defendant cites other Court of Appeals panels which have placed the "burden of proof" on the plaintiff to demonstrate noncompliance with the statute. See _Miller v Swanson,_ 95 Mich App 36, 40; 289 NW2d 875 (1980), _Capman v Harper-Grace Hosp,_ 96 Mich App 510; 294 NW2d 205 (1980), _Brown v Siang,_ 107 Mich App 91, 106; 309 NW2d 575 (1981), lv den 419 Mich 875 (1984), _Cushman v Frankel,_ 111 Mich App 604, 608; 314 NW2d 705 (1981), lv den 419 Mich 875 (1984), _Rome v Sinai Hosp of Detroit,_ 112 Mich App 387, 392; 316 NW2d 428 (1982), lv den 422 Mich 947 (1985), _Horn v Cooke,_ 118 Mich App 740; 325 NW2d 558 (1982), _Sabatini v Marcuz,_ 122 Mich App 494, 497; 332 NW2d 512 (1983), rev'd on other grounds 419 Mich 873 (1984), _Benson v Granowicz,_ 140 Mich App 167; 363 NW2d 283 (1984), lv den 422 Mich 976 (1985), _Harte v Sinai Hosp of Detroit,_ 144 Mich App 659, 663; 375 NW2d 782 (1985), _Kunath v Sinai Hosp of Detroit,_ 149 Mich App 32, 35; 385 NW2d 715 (1986), _Feinberg v Straith Clinic,_ 151 Mich App 204, 211; 390 NW2d 697 (1986), and _Osborne v Arrington,_ 152 Mich App 676, 682; 394 NW2d 67 (1986).

bourn rev), § 2483 *et seq.,* pp 276 ff.; McCormick, Evidence (3d ed), § 336, p 946. One of these meanings is the burden of persuasion or the risk of nonpersuasion. The other is the burden of going forward or the risk of nonproduction. *Kar v Hogan,* 399 Mich 529; 251 NW2d 77 (1976). As explained by Professor McCormick:

> The burden of producing evidence on an issue means the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced. It is usually cast first upon the party who has pleaded the existence of the fact, but as we shall see, the burden may shift to the adversary when the pleader has discharged his initial duty. The burden of producing evidence is a critical mechanism in a jury trial, as it empowers the judge to decide the case without jury consideration when a party fails to sustain the burden.
>
> The burden of persuasion becomes a crucial factor only if the parties have sustained their burdens of producing evidence and only when all of the evidence has been introduced. It does not shift from party to party during the course of the trial simply because it need not be allocated until it is time for a decision. When the time for a decision comes, the jury, if there is one, must be instructed how to decide the issue if their minds are left in doubt. The jury must be told that if the party having the burden of persuasion has failed to satisfy that burden, the issue is to be decided against him. If there is no jury and the judge finds himself in doubt, he too must decide the issue against the party having the burden of persuasion. [McCormick, *supra,* § 336, p 947.]

The immediate effect of a presumption is to shift the burden of going forward with the evidence related to the presumed fact. Rule 301 of the Michigan Rules of Evidence provides:

In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Thus, the function of a presumption is to place the burden of producing evidence on the opposing party:

It is a procedural device which allows a person relying on the presumption to avoid a directed verdict, and it permits that person a directed verdict if the opposing party fails to introduce evidence rebutting the presumption.

Almost all presumptions are made up of permissible inferences. Thus, while the presumption may be overcome by evidence introduced, the inference itself remains and may provide evidence sufficient to persuade the trier of fact even though the rebutting evidence is introduced. But always it is the inference and not the presumption that must be weighed against the rebutting evidence. [*Widmayer v Leonard*, 422 Mich 280, 289; 373 NW2d 538 (1985).]

In the context of the present circumstances, the defendant hospital or health care provider, as the party who has pleaded the existence of the operative facts (validity of the arbitration agreement), bears the initial burden of going forward with evidence establishing that the arbitration agreement was executed in strict compliance with the MMAA. We hold that the statutory presumption of validity accrues once the defendant offers evidence that

(1) A written arbitration agreement complying with the provisions of the MMAA has been signed by the person receiving health care or treatment or his legal representative;

(2) The arbitration agreement provides that the offer to arbitrate, if accepted by the patient, must be revocable in writing for sixty days;

(3) The arbitration agreement states, above the signature line in twelve-point boldface type: "Tʜɪs ᴀɢʀᴇᴇ-ᴍᴇɴᴛ ᴛᴏ ᴀʀʙɪᴛʀᴀᴛᴇ ɪs ɴᴏᴛ ᴀ ᴘʀᴇʀᴇQᴜɪsɪᴛᴇ ᴛᴏ ʜᴇᴀʟᴛʜ ᴄᴀʀᴇ ᴏʀ ᴛʀᴇᴀᴛᴍᴇɴᴛ ᴀɴᴅ ᴍᴀʏ ʙᴇ ʀᴇᴠᴏᴋᴇᴅ ᴡɪᴛʜɪɴ 60 ᴅᴀʏs ᴀғᴛᴇʀ ᴇxᴇᴄᴜᴛɪᴏɴ ʙʏ ɴᴏᴛɪғɪᴄᴀᴛɪᴏɴ ɪɴ ᴡʀɪᴛɪɴɢ ᴛᴏ ―――――";

(4) The patient has been given a booklet detailing the specific provisions of the arbitration agreement;

(5) The patient has been given a copy of the arbitration agreement; and

(6) The offer to arbitrate did not precede the provision of emergency care.

If the trial court determines that the arbitration agreement itself complies with the provisions of the MMAA, and that other independent evidence demonstrates that the patient has been given a copy of both the agreement and the booklet in a nonemergency setting, then the agreement to arbitrate must be presumed valid. Once a showing is made which gives rise to the presumption, it will stand unless rebutted by evidence that either demonstrates noncompliance with the statutory requirements set forth above or establishes one or more defenses, such as coercion, mistake, duress, or fraud.

Evidence which a defendant might present to sustain his ultimate burden of persuasion could include proof of habit or routine utilized by the hospital in admitting its patients. We recognize, especially in a hospital setting, that it would be unrealistic to expect specific recall on the part of hospital admitting personnel in each individual

case. Thousands of patients are admitted to hospitals each year, and, in most instances, there is nothing out of the ordinary about any given admission which makes it subject to special recollection. Thus, evidence of the habit of a person or of the routine practice of an organization is relevant to establish that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. MRE 406.[6] Any other rule would make it virtually impossible for a defendant hospital or health care provider to prove compliance with the requirements of the MMAA.

In order to give evidentiary force to the statutory presumption, as well as meaning and purpose to the MMAA, we disagree with the holding of *Moore v Fragatos, supra,* to the extent that it places the burden on the defendant to prove by clear and convincing evidence that the plaintiff knowingly, intelligently, and voluntarily waived his right to court access.

We do not infuse constitutional concerns equivalent to those in a criminal proceeding into a civil litigant's contractual choice-of-forum decision. A party's voluntary decision to arbitrate neither involves the complete relinquishment of a constitutional right nor raises the specter of procedural due process violations such as those presented in *Fuentes v Shevin,* 407 US 67; 92 S Ct 1983; 32 L Ed 2d 556 (1972). See *Arkoosh v Dean Witter &*

---

[6] There is general agreement that habit evidence is highly persuasive as proof of conduct on a particular occasion. See *Werney v Reid,* 219 Mich 257; 189 NW 30 (1922); *Alpena Nat'l Bank v Hoey,* 281 Mich 307; 274 NW 803 (1937); *Hoffman v Rengo Oil Co, Inc,* 20 Mich App 575; 174 NW2d 155 (1969); *Mason v Lovins,* 24 Mich App 101, 110-112; 180 NW2d 73 (1970); *Taylor v Wyeth Laboratories, Inc,* 139 Mich App 389; 362 NW2d 293 (1984). See, generally, 1A Wigmore, Evidence (3d ed), §§ 92, 93, pp 1607, 1610; McCormick, Evidence (2d ed), § 162, p 340; 1 Jones, Evidence (5th ed), § 191, p 332.

*Co, Inc,* 415 F Supp 535, 544 (D Neb, 1976), aff'd
571 F2d 437 (CA 8, 1978).

We further note that a person's decision to
arbitrate a medical malpractice dispute and the
consequential waiver of a jury trial in a civil case
is not tantamount to deprivation of a fundamental
constitutional right. The Constitution of the
United States does not confer a federal constitu-
tional right to trial by jury in state court civil
cases. US Const, Am VII; *Curtis v Loether,* 415 US
189; 94 S Ct 1005; 39 L Ed 2d 260 (1974). More-
over, the Michigan Constitution provides in perti-
nent part:

> The right of trial by jury shall remain, *but shall
> be waived in all civil cases unless demanded by
> one of the parties in the manner prescribed by
> law.* [Const 1963, art 1, § 14. Emphasis added.]

The right to a jury trial in a civil action is
therefore permissive, not absolute.

The MMAA incorporates various safeguards to
ensure the fairness of the arbitration process. The
statute requires that a patient be given a copy of
the agreement to read and sign. A patient's signa-
ture evidences that he has read the agreement,
which in turn recites that he has been given an
information booklet that further explains the arbi-
tration system. As an additional safeguard, the
patient has a statutorily mandated sixty-day "cool-
ing off" period within which he may unilaterally
rescind the agreement to arbitrate. A statement in
twelve-point boldface type emphasizes that a pa-
tient need not agree to arbitrate, and the prohibi-
tion against offering the agreement at the time a
patient is undergoing emergency treatment con-
tributes to an informed decision. Medical treat-
ment cannot be withheld merely because a patient
elects not to sign the agreement.

The statutory presumption provided for by the MMAA is wholly consistent with common-law principles of contract law which hold that the burden of proving nonarbitrability is assigned to the party seeking to avoid such an agreement and not to the party seeking to enforce such an agreement. See *John Wiley & Sons v Livingston,* 376 US 543, 546-547; 84 S Ct 909; 11 L Ed 2d 898 (1964); *Acme Cut Stone Co v New Center Development Corp,* 281 Mich 32; 274 NW 700 (1937); *Kaleva-Norman-Dickson School Dist No 6 v KND Teachers' Ass'n,* 393 Mich 583, 587; 227 NW2d 500 (1975). Michigan law further presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents. See, generally, *Ensign v Dunn,* 181 Mich 456; 148 NW 343 (1914); *Meade v Brown,* 218 Mich 556; 188 NW 514 (1922); *Int'l Transportation Ass'n v Bylenga,* 254 Mich 236, 239; 236 NW 771 (1931). The purpose of this rule is well recognized—to preserve the integrity and stability of written instruments.

The MMAA and its concomitant contractual waiver of the right to court access and jury trial reflect the Legislature's response to a perceived medical malpractice crisis in Michigan. Arbitration has long been recognized as a viable alternative to the litigation process. *Detroit v Jackson,* 1 Doug 106 (1843); *Chicago & M L S R Co v Hughes,* 28 Mich 186 (1873); *Shapiro v Patrons' Mutual Fire Ins Co of Michigan,* 219 Mich 581, 586; 189 NW 202 (1922); *Detroit v Kutsche & Co,* 309 Mich 700; 16 NW2d 128 (1944).

If it had been the intent of the Legislature to do no more than establish a presumption which accrued only after the defendant fulfilled the burden of demonstrating a knowing, intelligent, and voluntary waiver, then the presumption would serve little or no purpose. The practical effect of placing

such a burden on the health care provider would be to severely undermine the objectives of the MMAA. As discussed earlier, it could not be expected that most hospital employees would have independent recollection of the details surrounding the admission of individual patients. The statutory presumption, in our view, is not only an evidentiary rule of procedural convenience, but it also is one which is grounded in reality.

In *Johnson v Secretary of State,* 406 Mich 420, 432; 280 NW2d 9 (1979), we recognized the power of the Legislature to allocate the evidentiary burdens of the parties:

> The burden of producing evidence is not invariably allocated to the pleader of the fact to be proved. That burden may be otherwise allocated by the Legislature or judicial decision based, among other factors, on an estimate of the probabilities, fairness and special policy considerations, and similar concerns may justify the creation, judicially or by law, of a presumption to aid the party who has the burden of production.

We now apply these principles to the cases at hand.

IV

In *Guertin,* plaintiff averred that he never received an informational booklet explaining the arbitration agreement and that at the time he signed the arbitration agreement it was simply presented for signature without explanation. The form and content of the arbitration agreement conformed to statutory requirements.

Although plaintiff specifically recalled not getting a copy of the booklet, he could not remember the date of his admission, how old he was on the

date of admission, who admitted him or even the sex of the individual who admitted him, or very much else about his admission. He could not recall anything being said to him when he was handed the arbitration agreement except: "[S]ign on the dotted line."

Plaintiff testified that it was his common practice to read materials provided to him and, further, that he was a high school graduate able to read and write.

Admitting clerk Victoria Gorney was involved in the admission of approximately 2,500 patients per year to the hospital and was unable to specifically recall the admission of plaintiff. But she did testify that it was her normal procedure relative to admission to supply each patient with an arbitration brochure. Mrs. Gorney testified that she followed the above procedure with every patient she admitted and she could recall no exception that occurred in December, 1979. It also appears that Mrs. Gorney informed patients to the effect that even if they signed the agreement and did not "renege" within sixty days, they could still "sue the hospital" in a court of law and still have the right to a jury, "if the arbitration agreement [sic, award] was in [their] favor . . . ."

Plaintiff argues that the agreement to arbitrate should be declared invalid because the standard explanation given by Mrs. Gorney to admittees was misleading.

The testimony of these two witnesses, plaintiff Guertin and Mrs. Gorney, formed the basis for the trial court's decision. It concluded that plaintiff had received the required information booklet on the basis of Mrs. Gorney's testimony concerning her habit and routine practices in the normal course of business. The trial court found the plain-

tiff, due to his selective memory, not to be a credible witness. Its conclusion was that the plaintiff had the ability and opportunity to read the arbitration agreement, but simply chose not to do so. Thus, the trial court found that plaintiff had not gone forward with sufficient evidence to establish the invalidity of the arbitration agreement which conformed to the MMAA.

The Court of Appeals reversed the decision of the trial court on the basis that it had erred by allocating the burden of proof to the plaintiff. *Guertin, supra,* p 423.

We are disturbed by the explanation which Mrs. Gorney routinely gave to patients upon their admission to the hospital. Her explanation was inaccurate and misleading. However, there is no evidence which suggests that plaintiff signed the agreement in reliance on her representation. To establish either fraudulent or an innocent misrepresentation, a party must demonstrate that he acted in reliance upon the alleged misrepresentation. *Hi-way Motor Co v Int'l Harvester Co,* 398 Mich 330, 336; 247 NW2d 813 (1976); *United States Fidelity & Guaranty v Black,* 412 Mich 99, 117-118; 313 NW2d 77 (1981). *Eaton Corp v Magnavox Co,* 581 F Supp 1514, 1535 (ED Mich, 1984).

Here, the evidence does not demonstrate that the admitting clerk's representations were even a contributing influence upon plaintiff's decision to sign the agreement. In an affidavit submitted in support of his "Response to Motion for Accelerated Judgment," plaintiff swore: "That at the time he signed the arbitration agreement it was simply presented for signature without any explanation." This is consistent with plaintiff's testimony at the evidentiary hearing, where he could recall nothing said to him other than to "sign on the dotted line." Plaintiff gave several reasons for signing the docu-

ment, none of which related to Mrs. Gorney's explanation of the arbitration process.

In a case such as this, where a key element is the believability of the witnesses, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). We conclude that the trial court did not clearly err in evaluating the evidence before it and in placing the burden of going forward with evidence to invalidate a conforming arbitration agreement upon the plaintiff. We are not left with a definite and firm conviction that a mistake was committed by the trial court. *Tuttle v Dep't of State Highways,* 397 Mich 44; 243 NW2d 244 (1976).

For the reasons stated, we conclude that the judgment of the trial court should be reinstated.

v

Mrs. McKinstry went to Saginaw General Hospital for a routine stress test ordered by her doctor. She went through admitting and was taken to the labor section where the stress test was performed. Shortly thereafter, she was advised by a physician that she was going to be admitted because she was spilling proteins into her urine and her blood pressure was elevated. Mrs. McKinstry was placed in a patient room and sometime later a hospital representative brought some papers to her room.

The form and content of the arbitration agreements signed by Mrs. McKinstry were in complete conformity with the MMAA statutory requirements. During the evidentiary hearing, Mrs. McKinstry conceded that her signature was on the arbitration agreements signed on October 17, 1978.

Mrs. McKinstry, a high school graduate, was no stranger to arbitration agreements. She previously

had executed arbitration agreements on September 26, 1978, and October 10, 1978, only a few weeks prior to the admission in question. Nonetheless, she claimed that on this hospitalization, and this one hospitalization only, she did not receive the brochure from Saginaw General Hospital and did not understand or remember signing the arbitration agreements.

The admitting clerk for defendant hospital, Ms. Federspiel, could not recall the admission of Mrs. McKinstry six and one-half years before. She testified that the normal admitting procedure included offering the arbitration agreement with an explanation of its contents, and advising each patient who signed the agreement that he would have sixty days during which to change his mind. She also testified that each patient was provided with a copy of the booklet and the agreement.

Plaintiffs contend that Mrs. McKinstry was treated in an emergency situation. Mrs. McKinstry indicated that she was afraid and upset when first admitted, concerned over the welfare of her unborn child. She testified, however, that other than being upset she was "in [her] faculties" and was not physically ill.

We conclude that the trial court and the Court of Appeals properly allocated the burdens of the parties. We do not find clear error in the trial court's conclusion that defendants complied with the MMAA, that the arbitration agreements were valid on their faces, and that the plaintiffs failed in their burden to go forward with sufficient evidence to rebut the presumption of validity. Mrs. McKinstry was in sufficient physical and mental condition to sign the valid arbitration agreements and did so in a nonemergency setting.

Given the defendants' prima facie showing of compliance with the MMAA, and the plaintiffs'

failure to rebut the presumption, the validity of
the arbitration agreements was established.

### VI

In *McKinstry,* we are also asked to decide
whether a plaintiff mother could bind her child to
arbitration where she signed the agreement to
arbitrate while her child was in utero.

Under § 5046(2) of the MMAA, it is said:

> A minor child shall be bound by a written
> agreement to arbitrate disputes, controversies, or
> issues upon the execution of an agreement on his
> behalf by a parent or legal guardian. The minor
> child may not subsequently disaffirm the agree-
> ment.

Mrs. McKinstry not only signed an arbitration
agreement involving her medical treatment, but
she also signed such an agreement on behalf of the
child, Amanda, who was not born at the time the
agreement was signed. Mrs. McKinstry argued
unsuccessfully in the Court of Appeals that
Amanda could not be bound by the alleged arbitra-
tion agreement because a fetus in utero is not a
minor child within the meaning of the statute. She
also contended that if § 5046(2) of the MMAA were
construed so as to include a fetus in utero under
the definition of a minor child, the constitutional
right to court access and jury trial would be taken
away from the fetus in utero.

In construing a statute, we primarily seek to
determine and give effect to the legislative intent.
*Nash v DAIIE,* 120 Mich App 568, 571; 327 NW2d
521 (1982), lv den 417 Mich 1088 (1983). As stated
in 73 Am Jur 2d, Statutes, § 145, p 351:

> In the interpretation of statutes, the legislative

will is the all-important or controlling factor. Indeed, it is frequently stated in effect that the intention of the legislature constitutes the law. Accordingly, the primary rule of construction of statutes is to ascertain and declare the intention of the legislature, and to carry such intention into effect to the fullest degree. A construction adopted should not be such as to nullify, destroy, or defeat the intention of the legislature.

Section 5046(2) of the arbitration statute is aimed at allowing parents to bind their children, all of their children, to arbitration rather than permitting a child subsequently to avoid arbitration at the age of majority. In view of this legislative purpose, the minor child born after parental consent to arbitration cannot be distinguished from that of a minor child who was born prior to parental consent. We believe that the Legislature did not intend to create such a distinction.

The logic of our position is borne out by the fact that neither a fetus in utero nor a minor child has the capacity to contract for medical care on his own behalf and can only do so through a parent or guardian.

The Court has, in other contexts, recognized that the rights of a viable unborn child are similar to those of a minor child. In *LaBlue v Specker,* 358 Mich 558; 100 NW2d 445 (1960), the Court recognized the right of an afterborn child to bring a dramshop action for damages as a result of the death of her putative father. In *Womack v Buchhorn,* 384 Mich 718; 187 NW2d 218 (1971), it was held that an action will lie at common law, by a person prenatally injured and hence born injured, for negligence. The status of the fetus in utero was further delineated in *O'Neill v Morse,* 385 Mich 130; 188 NW2d 785 (1971), where the Court held that a viable infant *en ventre sa mere* (in its

mother's womb) at the time of the injury which caused death was a person within the meaning of the wrongful death statute, and that the administrator of the infant's estate could maintain an action for damages under the statute.

The *Womack* and *O'Neill* decisions establish that under Michigan common law a fetus in utero is a person for purposes of tort law if the fetus is alive subsequent to the alleged injury or if the fetus was viable at the time of alleged injury.

Thus, the status of a fetus in utero under Michigan common law regarding tort actions is consistent with our conclusion that a fetus in utero should be considered a minor child within the language of § 5046(2) if the fetus is born alive, subsequent to the claimed injury, or if the fetus was viable at the time of the alleged injury.

Our interpretation of § 5046(2) is a departure from the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child. *Schofield v Spilker,* 37 Mich App 33; 194 NW2d 549 (1971); *Reliance Ins Co v Haney,* 54 Mich App 237; 220 NW2d 728 (1974); 67A CJS, Parent and Child, § 114, pp 469-470. However, the common law can be modified or abrogated by statute. *Bean v McFarland,* 280 Mich 19; 273 NW 332 (1937); *O'Brien v Hazelet & Erdal,* 410 Mich 1; 299 NW2d 336 (1980). Thus, a child can be bound by a parent's act when a statute grants that authority to a parent.[7] *Reliance Ins Co, supra,* p 242; *Wilson v Kaiser Foundation Hospitals,* 141 Cal App 3d 891; 190 Cal Rptr 649 (1983). We believe that § 5046(2) of the MMAA changes the

[7] We also note that California has recognized that the authority of a parent to bind "the child to arbitrate . . . dispute[s] . . . is implicit in a parent's right and duty to provide for the care of his child." *Doyle v Giuliucci,* 62 Cal 2d 606, 610; 43 Cal Rptr 697; 401 P2d 1 (1965).

common law to permit a parent to bind a child to an arbitration agreement.

In the case before us, we therefore conclude that plaintiff Amanda McKinstry was bound by the valid arbitration agreement signed by her mother.

## VII

Accordingly, in *McKinstry,* we affirm the decision of the Court of Appeals.

In *Guertin,* we reverse the judgment of the Court of Appeals and reinstate the order of the trial court granting accelerated judgment for defendants.

RILEY, C.J., and LEVIN, BRICKLEY, and BOYLE, JJ., concurred with GRIFFIN, J.

ARCHER, J. (*dissenting in Guertin only*). I disagree with the majority's "presumption" analysis, and find the Court of Appeals holding in *Moore v Fragatos,* 116 Mich App 179; 321 NW2d 781 (1982) (which places the burden on the defendant to prove by clear and convincing evidence that the patient knowingly, intelligently, and voluntarily waived rights to court access and to revoke the agreement within sixty days), to represent the sounder approach.

As noted in *Moore, supra,* access to the court system is a fundamental right. *Id.* at 185. The Medical Malpractice Arbitration Act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* entails the waiver of that fundamental right. In the area of civil law, courts must indulge every reasonable presumption against the waiver of a fundamental right, *Aetna Ins Co v Kennedy,* 301 US 389, 393; 57 S Ct 809; 81 L Ed 1177 (1937), and there can be no presumption that a party acquiesces to the loss

of a fundamental right. *Ohio Bell Telephone Co v
Ohio Public Utilities Comm,* 301 US 292, 307; 57 S
Ct 724; 81 L Ed 1093 (1937). Accordingly, the
burden of proving the waiver of the right to court
access is on the party asserting the waiver.

MCL 600.5041(7); MSA 27A.5041(7) and MCL
600.5042(8); MSA 27A.5042(8) state that an "agree-
ment to arbitrate which includes the provisions of
this section shall be presumed valid." This lan-
guage does not provide a presumption that the
waiver contained therein is knowing and volun-
tary. The majority has, in essence, construed the
"presumption" to be rebuttable. Thus, once the
defendant has offered evidence to establish that
the arbitration agreement itself complies with the
provisions of the arbitration act, it has made out a
prima facie case. The presumption then casts the
burden of proof to the plaintiff. However, when
classifying the presumption as rebuttable, once the
plaintiff puts at issue his contention that the
alleged waiver of his constitutional rights was
unknowing, involuntary, or unintelligent, the pre-
sumption would disappear, and the burden of proof
would remain with the defendants to affirmatively
show the contrary. See *Krisher v Duff,* 331 Mich
699, 705; 50 NW2d 332 (1951); *Klat v Chrysler
Corp,* 285 Mich 241, 247; 280 NW 747 (1938).

The question then becomes what quantum of
evidence is necessary for defendants to sustain
their burden. For the defendants to rely on rote
testimony of habit and custom is clearly not
enough. The true beneficiary of the MMAA is the
health care provider. However, with the benefit
should come the burden of producing clear, posi-
tive, and credible evidence that the statutory
"safeguards to ensure the fairness of the arbitra-
tion process" have been strictly followed.

It is health care providers who should be the

most motivated to conform to the requirements of the act, because they benefit from it. It is health care providers who have the personnel who can be trained in very simple, non-time-consuming procedures in order to record and keep relevant evidence. The burden should be placed on the party which can best meet it. That party, in all cases involving health care providers and patients, would be the health care provider. It is a small burden, in exchange for all the benefits they acquire from the agreement, to be obligated to simply and inexpensively memorialize the fact of each individual patient's knowing, intelligent, and voluntary waiver.

There are numerous ways a hospital or physician can provide more than rote habit or custom evidence to support their burden of showing a knowing, intelligent, and involuntary waiver within the execution of an arbitration agreement.[1] For example, a slight modification of the arbitration form to allow a space for the patients to initial the following seems to be the least burdensome: (1) that the patient has been given a booklet detailing the specific provisions of the arbitration agreement at the time of affixing the initials, (2) that the patient was given a copy of the agreement at the time of affixing the initials, (3) that the offer to arbitrate did not precede emergency medical care, and (4) that the patient has been informed that the offer, if accepted, can be revoked within sixty days if revoked in writing.

Under the majority's holding, all that is needed

---

[1] Suggestions made to the court include: (1) providing the patient with an audio tape to listen to, along with the agreement and booklet; (2) taped vocal acceptance on the part of the patient; (3) having an employee whose job is to explain the agreement to the patient and to have that employee personally witness the signature of the patient, and (4) providing the patient with the agreement and booklet before he comes to the hospital for admittance.

to obtain the benefit of the statutory presumption of validity is the patient's signature and an employee trained to produce testimony indicative of habit and custom, irrespective of whether the "usual" procedure was followed in the patient's particular case. This is insufficient. If the words of the trial judge in the instant case are used as an indicator, trial judges agree that testimony of custom and habit or standard procedures are insufficient methods of proving compliance with the act to meet an initial burden or to rebut the evidence presented by the plaintiff. During the admitting clerk's testimony in this case, wherein she testified on the basis of her usual procedure, the trial court stated:

> I am more interested [in] what she did, if she can remember what [sic] this patient, not what she ordinarily does. This is what I have got to decide on.

While hospital employees simply say that they *always* offer the arbitration agreement in a manner consistent with the statute, the patient has the impossible burden of proving the arbitration agreement was not properly offered to him. Placing the burden on the plaintiff to show the *invalidity* of the agreement forces the plaintiff to prove a nullity, which is one of the most difficult things to do in the field of evidence. Yet, at a time, usually during admission to the hospital, when the plaintiff is likely to be apprehensive, scared, in pain, and least likely to absorb the importance of the documents he may be signing, the majority would have the plaintiff be responsible for gathering evidence to show that the statutory requirements were *not* complied with.

I am also concerned about the testimony of the

hospital employee (the admitting clerk) in this case. *Ante,* pp 186-187. A review of the hospital employee's explanation of the arbitration information that she routinely gave to patients should have enlightened the majority as to how "routinely" patients have the potential to be misled or misinformed. Relying upon the clerk's testimony does not, in my mind, meet the burden of proof.

Perhaps safeguards could be adopted that would effectuate the policy of the Legislature. The patient should know what is being signed and what the result of that signature will mean. If accomplished, the result would facilitate proofs and diminish the likelihood of evidentiary hearings, which would save time for the court and the parties. The majority does not provide safeguards.

I therefore dissent from the majority's failure to place the burden of proof of clear, positive, and credible evidence on the health care provider and hospital.

CAVANAGH, J. (*dissenting*). As I have not been persuaded to alter my view of this statute as expressed in *Morris v Metriyakool,* 418 Mich 423, 475-487; 344 NW2d 736 (1984), I do not join the debate over the burden of proof.