737 F.Supp. 427 (1989)
In re AIR CRASH DISASTER AT DETROIT METROPOLITAN AIRPORT ON AUGUST 16, 1987.
Charles M. RADEMACHER, Personal Representative of the Estate of the Unborn Child of Roberta Elizabeth Rademacher, Plaintiff,
v.
McDONNELL DOUGLAS CORPORATION, Northwest Airlines, Inc., Defendants.
MDL No. 742.
Civ. A. No. 88-CV-72171-DT.
United States District Court, E.D. Michigan, S.D.
October 17, 1989.
Charles Brewer, Phoenix, Ariz., Stanley Chesley, Cincinnati, Ohio, Lee Kreindler, New York City, Gerald Lear and Thomas Meehan, Washington, D.C., and Richard Schaden, Birmingham, Mich., for plaintiffs' Steering Committee.
Carroll E. Dubuc, Laxalt, Washington, Perito and Dubuc, Washington, D.C., for defendant Northwest Airlines.
John J. Hennelly, Bryan, Cave, McPheeters & McRoberts, Los Angeles, Cal., and Donald E. Shely, Dykema Gossett, Detroit, Mich., for defendant McDonnell Douglas.

ORDER
JULIAN ABELE COOK, Jr., Chief Judge.
Roberta Elizabeth Rademacher, who was employed by Northwest Airlines, Inc. (Northwest) to work as a flight attendant on Flight 255 on August 16, 1987, died in the air crash at the Detroit Metropolitan Airport in Detroit, Michigan. It is uncontroverted that she was due to give birth on January 3, 1988. Plaintiff's Answer to Interrogatory No. 18. The fetus did not survive the air crash. Plaintiff, Charles M. Rademacher, surviving husband and father of the unborn fetus, filed a Complaint as the personal representative of the unborn child, in which he invoked the Michigan Wrongful Death and Survival statute and alleged claims of negligence, breach of warranty and recklessness against the Defendants, McDonnell Douglas Corporation (MDC) and Northwest.
On July 17, 1989, Northwest filed the present Motion for Summary Judgment, arguing that the Michigan Wrongful Death Act will not allow any recovery in this case because the Rademacher fetus was not viable when it was fatally injured.[1]

I
In O'Neill v. Morse, 385 Mich. 130, 188 N.W.2d 785 (1971), the Court determined that an "eight-month-old viable infant [fetus] at the time of the injury which caused his death" was a person within the context of the Michigan Wrongful Death Statute. The fetus was stillborn as a result of injuries that had been inflicted upon him by the defendants. The Court concluded that birth was an arbitrary measure of when *428 life began and allowed recovery for the death of the unborn child under the Wrongful Death Act.
Five years later, the Michigan Court of Appeals considered the same question in Toth v. Goree, 65 Mich.App. 296, 237 N.W.2d 297 (1975), lv. den., 396 Mich. 836 (1976), and held that a three-month-old nonviable stillborn fetus was not a person under the Michigan Wrongful Death Act, and, hence, could not recover under the statute, reasoning that, "[w]hile much of the language in O'Neill is ambiguous [regarding] viability, it does tend to exclude the nonviable fetus from its discussion." Toth, supra, 65 Mich.App. at 300-01, 237 N.W.2d 297. However, the Toth Court made clear in its holding that:
[w]hile Womack[2] does give a cause of action for prenatal injury, that action is not without limits. Those limits are drawn. The infant must have been born alive as in Womack or have been viable as in O'Neill in order to have an action brought in the infant's own behalf, whether as a common law-action or as a wrongful death action.
Toth, supra, at 302, 237 N.W.2d 297.
Earlier this year, the Michigan Court of Appeals, in Jarvis v. Providence Hospital, 178 Mich.App. 586, 444 N.W.2d 236 (1989), held that a wrongful death action could be maintained on behalf of a fetus that, although not viable at the time of the negligence, was viable at the time of the resulting injury. In that case, the fetus was fourteen weeks old when the mother was contaminated with blood that was infected with hepatitis. Four months later, the mother was diagnosed with hepatitis. The fetus was subsequently delivered stillborn. During the ensuing lawsuit, the Hospital argued that the case should be dismissed because the fetus was not viable at the time of the negligence. Nevertheless, the Court concluded that Jarvis had stated a cause of action after positing that "a negligence action for prenatal injury may be maintained [under the Michigan common law] on behalf of a fetus if (1) the fetus is subsequently born alive ... or (2) the fetus was viable at the time of the injury. Jarvis, supra, at 591, 444 N.W.2d 236. In addressing the Hospital's contention that the fetus was not viable at the time of the injury, the Jarvis Court reasoned:
Although we agree that viability remains a crucial consideration in determining whether a tortfeasor is liable for injury to an unborn fetus, we conclude that defendant's argument is without merit under the fact situation presented here. Rather, we are persuaded that the maintenance of the instant complaint comports with the principles developed by our Supreme Court in response to prenatal injury claims.
Id. at 591-92, 444 N.W.2d 236.
This holding complies with O'Neill, supra, and expands the concept to include that recovery is available if the fetus is viable when the resulting injury manifests itself.[3]
In the case at bar, Rademacher submits that a wrongful death action is available in Michigan for the death of a nonviable fetus and contends that O'Neill does not clearly establish the viability of a fetus as a prerequisite element to recovery under the State Wrongful death Act. This Court agrees. However, this apparent lack of clarity was noted by the State Court of Appeals in Toth when it opined that *429 O'Neill "does tend to exclude the nonviable fetus." Toth, supra, 65 Mich.App. at 300-01, 237 N.W.2d 297. See also, McKinstry v. Valley OB-GYN Clinic, 428 Mich. 167, 192, 405 N.W.2d 88 (1987) ("Womack and O'Neill ... establish that under Michigan common law a fetus in utero is a person for the purposes of tort law if the fetus is alive subsequent to the alleged injury or if the fetus was viable at the time of the alleged injury").
Michigan has seen fit to utilize viability as a proper point for determining liability, if any, for the wrongful death of an unborn fetus:[4]
[W]e are well aware of the anomaly in the law which, under Roe [v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)], allows the mother to terminate the life of her fetus within the first two trimesters, but under Womack and O'Neill, requires persons to exercise due care for the nonviable fetus' well being. However, as Roe was balancing only the rights of the mother against the right of the state to protect a "potential human being," Roe did not determine whether a state might protect the "potential human being" from conduct of a third party which forseeably endangers the life of a fetus, whether or not the fetus is viable.
Jarvis, 178 Mich.App. at 596, 444 N.W.2d 236.
Therefore, this Court finds the Plaintiff's arguments to be unpersuasive and concludes, as a matter of law, that in order to maintain this action under Michigan law, the Rademacher fetus must have been viable at the time of the accident.

II
The Court now turns its attention to the question of the viability of this fetus. In determining that the three-month-old fetus was not viable, the Toth Court cited Roe v. Wade, 410 U.S. at 160, 93 S.Ct. at 730 (1973), and stated "[a] fetus is `viable' when it is `potentially able to live outside the mother's womb, albeit with artificial aid. Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks.'" Toth, supra, 65 Mich.App. at 299 n. 3, 237 N.W.2d 297. See also Mitchell v. Couch, 285 S.W.2d 901, 905 (Ky.App.1955). ("A fetus generally becomes viable between the sixth and seventh month of its existence, although there are instances of younger infants being born and surviving"); Right to Maintain Action for Death of Unborn Child, 84 A.L.R.3d 411, 432 n. 72 ("The word `viable' as used in most of the judicial decisions and as used in medical parlance, refers to the stage of prenatal development at which a fetus would be capable of independent existence if removed from its mother's womb, and it has often been noted that a fetus ordinarily becomes viable during the sixth or seventh month of its mother's pregnancy").
More recently, the Supreme Court in Webster v. Reproductive Health Services, ___ U.S. ___, ___, 109 S.Ct. 3040, 3055, 106 L.Ed.2d 410 (1989), upheld a Missouri statute which essentially created a "presumption of viability at 20 weeks, which the physician must rebut with tests indicating the fetus is not viable prior to performing an abortion." The Supreme Court found this requirement to be reasonable after noting that the trial court had determined:
the medical evidence is uncontradicted that a 20-week fetus is not viable ... and that 23½ to 24 weeks gestation is the earliest point in pregnancy where a reasonable possibility of viability exists.... But it also found that there may be a 4-week error in estimating gestational age, which supports testing at 20 weeks.
Id.
The Court recognized that there is a margin of error in calculating gestational age, *430 and that this margin of error makes the state requirement of viability testing at twenty weeks reasonable. Webster found that, as a general proposition, a state regulation which requires viability-testing at twenty weeks, was not unreasonable, given that some pregnancies assumed to be twenty weeks along may well be twenty-four weeks along and may, in fact, be viable. The Webster Court neither overturned Roe with respect to viability nor found as a matter of law that viability occurs at twenty weeks.
In attempting to establish that viability is much earlier than twenty-four weeks as articulated in Roe, Rademacher submitted a letter from a Dr. John C. Wilke, who describes himself as a "nationally known physician, author and lecturer." His letter was sent in his capacity as the President of the National Right to Life Committee (NRL). Wilke writes that he "knows of twenty tiny survivors whose chronological age, as measured from the first day of their mother's last normal menstrual period, falls into the twentieth, twenty-first, twenty-second and twenty-third weeks of gestational age." Wilke's letter is supported by his own article that appeared in the NRL News, in which he lists the names of young infants who were born after only twenty to twenty-four weeks in gestation. However, Wilke acknowledges in his article that this information had not been verified.[5]
The Court does not believe that Rademacher has created a genuine issue of fact which is sufficient to defeat the pending motion for summary judgment. Expert evidence, which is offered in support of a motion for summary judgment, must be admissible as evidence at trial. See, Federal Rules of Civil Procedure 56(e). Wilke merely lists the names of "babies surviving at gestational ages less than 24 weeks" and then asks his readers for assistance in verifying the ages of the listed babies. He asks the general public to write to him if they recognize any of the babies' names and "let me know what you know, and I may be back in touch with you as a possible intermediary in obtaining the information and documentation that I need on some of these tiny ones."
This evidence is "so lacking in probative force and reliability that no reasonable expert could base an opinion on the data." Viterbo v. Dow Chemical Co., 646 F.Supp. 1420, 1424 (E.D.Tex.1986). Further, "where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading." Id., at 1425-26. It appears to this Court that Wilke is an ardent supporter and a leader of the Right to Life movement, and, as such, his opinion regarding the viability of a fetus cannot be accepted as objective.
This Court accepts the generally accepted Roe proposition that viability occurs at twenty-four weeks. (See also, Declaration of Robert A. Welch) ("[I]t is my opinion as well as the opinion of other experts in fetal viability that a fetus does not become viable until its gestational age is at least 25 weeks").

III
The Court now turns to determine whether there is an issue of fact regarding the gestational age of the Rademacher fetus. Rademacher submits a sonogram report[6] from July 13, 1987, which concludes that the "[e]stimated gestational age is 15.8 +/- 2 weeks." The fatal accident involving Northwest Flight 255 occurred five weeks later. Therefore, on the date of the *431 accident, the Rademacher fetus was 20.8 weeks old +/- 2 weeks. Therefore, the fetus was, at most, 22.8 weeks old.[7]
Thus, the subject fetus in this case was nonviable as a matter of law. Pursuant to the Michigan case law, a nonviable fetus has no cause of action under the Michigan Wrongful Death Act.
Accordingly, the Motion for Summary Judgment is granted in favor of the Defendants, Northwest and MDC.[8]
IT IS SO ORDERED.
NOTES
[1] Although both parties discuss the applicable Minnesota law in the alternative, neither party objects to the application of Michigan law. Accordingly, this Court will apply Michigan law.
[2] In Womack v. Buchhorn, 384 Mich. 718, 725, 187 N.W.2d 218 (1971), the Michigan Supreme Court overturned the long-standing prohibition against recovery for prenatal injuries and allowed a common law negligence action on behalf of an afterborn child for brain injuries that were sustained in an automobile accident which occurred when the child was a nonviable, four month old fetus.
[3] Plaintiff suggests that the Court should rely on Fryover v. Forbes, 176 Mich.App. 36, 439 N.W.2d 284 (1989), which reversed the trial court's dismissal of an action brought on behalf of a sixteen week nonviable fetus. However, in an Order entered on September 27, 1989, the Michigan Supreme Court reversed the Fryover appellate Court stating, "We do not find any basis in the legislative history or in the case law of this state to conclude that the legislature intended to create a cause of action for a nonviable fetus not born alive when it enacted and later amended the Wrongful Death Act." See, Fryover v. Forbes, 433 Mich. 878, 446 N.W.2d 292 (1989).
[4] Michigan is not alone in requiring a fetus to be viable in order to recover for wrongful death. See, Luff v. Hawkins, 551 A.2d 437 (Del. Sup.Ct.1988); DiDonato v. Wortman, 320 N.C. 423, 358 S.E.2d 489 (1987); Farley v. Mount Mary Hosp. Ass'n, 387 N.W.2d 42 (S.D.1986); Summerfield v. Superior Court, 144 Ariz. 467, 698 P.2d 712 (1985) (en banc); Amadio v. Levin, 509 Pa. 199, 501 A.2d 1085 (1985); Hopkins v. McBane, 359 N.W.2d 862 (N.D.1984); O'Grady v. Brown, 654 S.W.2d 904 (Mo.1983) (en banc); Volk v. Baldazo, 103 Idaho 570, 651 P.2d 11 (1982).
[5] Wilke wrote, "I'm prepared to make a firm statement that the stated ages of the majority of the babies listed above have been, or can be and will be, verified."
[6] The second declaration from Northwest expert, Dr. Robert A. Welch, states that "[a] sonogram at less than 20 weeks gestation is the most precise method known to medical science of estimating gestational age." This assertion is uncontroverted.

He further asserts that sonograms are "precise within plus or minus two weeks." In fact, the sonogram report, which was submitted to the Court by the Plaintiff, states that the sonogram performed on Mrs. Rademacher on July 13, 1987, provided results "plus or minus two weeks."
[7] Rademacher asserts that the fetus was potentially 24.8 weeks old on the date of the accident. He reasons that on July 13, 1987, the fetus was 15.8 weeks old. Then he asserts, based upon the language in Webster that "there may be a 4-week error in estimating gestational age," that the fetus on that date could have been 19.8 weeks. He then adds the five weeks between the sonogram and the accident to arrive at 24.8 weeks. This calculation is incorrect.

First, the sonogram report itself indicates that it is correct "+/- 2 weeks." Second, Webster did not consider the accuracy of a sonogram as a way of determining gestational age. It was merely held that it was not irrational for a state to require viability testing at 20 weeks. Inasmuch as viability is generally between 23½ weeks and 24 weeks and there may be a 4 week error in any given determination regarding gestational age. Therefore, Rademacher's attempt to add 4 weeks onto the age that was reported by the sonogram instead of the accepted margin of error of 2 weeks will not be considered by this Court.
[8] On July 17, 1989, MDC filed pleadings, in which it joined Northwest in argument against Rademacher. Although this Order speaks primarily of Northwest's positions on the issues in controversy, the decision of this Court is equally binding upon both Defendants.